# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CRIMINAL NO. 4:17-cr-116-2** |
| | § | |
| **STEPHEN E. STOCKMAN** | § | |
| | § | |

## UNITED STATES' CONSOLIDATED OPPOSITION TO DEFENDANT'S MOTIONS TO DISMISS, MOTION TO STRIKE SURPLUSAGE, AND MOTION FOR NOTICE OF EVIDENCE UNDER RULES 404 AND 609

The United States of America, through its undersigned attorneys, submits this consolidated response in opposition to defendant Stephen E. Stockman's motions to dismiss and to strike surplusage from the First Superseding Indictment, (R. Doc. 23), as well as the defendant's motion for pretrial notice of evidence admissible under Federal Rules of Evidence 404(b) and 609.   (*See* R. Docs. 92, 93, 94, 95, 96, and 97).   The indictment properly alleges that the defendant orchestrated a long-running and sophisticated scheme to defraud donors of hundreds of thousands of dollars by misrepresenting how their donations would be used and funneling the money through a web of sham charities and nonprofit organizations.   As alleged in the indictment, the defendant used these large donations not for the charitable and educational purposes repeatedly represented by the defendant to the donors, but rather to line his own pockets and to fund his campaigns for public office.   In the process, the defendant engaged in numerous violations of federal law, including the federal fraud laws, election laws, tax laws, and money laundering statutes.

Because these acts are unquestionably forbidden by federal criminal law, unprotected by the Constitution, and set forth clearly in the indictment, the defendant's motions to dismiss are without merit.   The same is true of the defendant's motion to strike surplusage, which improperly

seeks to remove from the indictment conduct that is inherent in the defendant's long-running scheme to defraud.   Finally, the defendant's motion for pretrial notice of material admissible under Rules 404(b) and 609 appears merely to request that the United States fulfill its preexisting notice requirements under those provisions; because the United States fully intends to do so and the defendant fails to explain why relief is required at this juncture, the defendant's motion is both unripe and moot.    For the reasons set forth below, the United States respectfully submits that the defendant's motions are meritless and should be denied.

## TABLE OF CONTENTS

I.   BACKGROUND .................................................................................................. 5

    A.   Procedural History............................................................................................ 5

    B.   Factual Background .......................................................................................... 5

II.  RESPONSE TO MOTION TO DISMISS COUNTS ONE THROUGH EIGHT (R. Doc. 93).................................................................................................. 10

    A.   Counts one through eight sufficiently allege that the defendant committed mail and wire fraud. ......................................................................................................11

        i.   The scheme to defraud charged in counts one through eight is unprotected by the First Amendment........................................................... 12

        ii.  Counts one through eight provide sufficient notice of the charges against the defendant.................................................................................... 17

    B.   There is no basis to dismiss counts two, five, six, and seven due to the death of the defendant's elderly victim................................................................................ 25

    C.   Counts one through five and eight are not multiplicitous. ...................................... 29

III. RESPONSE TO MOTION TO DISMISS COUNTS NINE THROUGH ELEVEN (R. Doc. 94)................................................................................................. 33

    A.   Count nine properly alleges that the defendant engaged in a conspiracy to make conduit contributions and false statements. .................................................. 33

    B.   Counts ten and eleven properly allege that the defendant caused false statements to the FEC. ............................................................................................... 39

IV.  RESPONSE TO MOTION TO DISMISS COUNT TWELVE (R. Doc. 92) ................ 41

    A.   The longstanding prohibition against illegal coordination is foundational to the federal campaign finance system. ...................................................................... 41

    B.   Count twelve of the superseding indictment alleges the essential elements of making an excessive campaign through coordination in the language of the statute. ...... 45

    C.   The statute prohibiting excessive campaign contributions through coordination is neither void for vagueness nor unconstitutional under the First Amendment. ................ 50

**V.     RESPONSE TO MOTION TO DISMISS COUNTS FOURTEEN THROUGH TWENTY-TWO, TWENTY-FOUR, AND TWENTY-SEVEN (R. Doc. 95)** ............ 53

    A.     The money laundering statutes are not unconstitutionally vague. .......................... 54

    B.     The money laundering statutes are not unconstitutionally vague as applied to the defendant's conduct. ....................................................................................... 55

**VI.     RESPONSE TO MOTION TO STRIKE SURPLUSAGE (R. Doc. 96)** ..................... 63

**VII.     RESPONSE TO REQUEST FOR PRETRIAL NOTICE OF RULE 404(B) AND RULE 609 MATERIAL (R. Doc. 97)** ........................................................... 67

**VIII.     CONCLUSION** ........................................................................................ 68

I.    **BACKGROUND**

    A.    Procedural History

On March 1, 2017, a federal grand jury in Houston returned an indictment charging Thomas Dodd, a former congressional employee and associate of the defendant, with conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349, and conspiracy to make conduit contributions and false statements, in violation of 18 U.S.C. § 371.   (Indictment, R. Doc. 1). Dodd entered into a plea agreement and pleaded guilty to these charges on March 20, 2017.   (*See* Plea Agreement, R. Doc. 20).   On March 28, 2017, the grand jury returned a 28-count First Superseding Indictment charging the defendant and Jason T. Posey, another of the defendant's former congressional employees and associates, with a variety of criminal offenses, including mail fraud, wire fraud, conspiracy, making false statements, making excessive campaign contributions, money laundering, and filing a false tax return.   (First Superseding Indictment, R. Doc. 23) (hereinafter "First Superseding Indictment").   Posey entered into a plea agreement and pleaded guilty to three counts of the superseding indictment on October 11, 2017.   (*See* Plea Agreement, R. Doc. 89).   Jury selection and trial of the defendant are scheduled to begin on March 19, 2018.

    B.    Factual Background

From 2010 to 2014, the defendant, a former member of the U.S. House of Representatives, engaged in a sophisticated scheme to defraud donors of hundreds of thousands of dollars by falsely representing to the donors that their donations would be used for charitable and educational purposes undertaken by legitimate nonprofit entities.   In reality, and as alleged in the superseding indictment, the defendant secretly diverted the donated funds to pay for a variety of personal and political expenses and to fund illegal contributions to the defendant's campaigns for federal office.

5

(First Superseding Indictment, at ¶ 17).   Virtually none of the money was used for the purposes described by the defendant to the donors.   And the purported nonprofit entities at issue were in fact mere shells, the primary function of which was to launder the fraudulent proceeds and conceal the ongoing scheme.

The superseding indictment sets out the manner and means of the defendant's scheme to defraud in detail, charging that the defendant and his co-conspirators "repeatedly made false representations in soliciting hundreds of thousands of dollars in donations" by telling donors "that their donations would be used for charitable and educational purposes, or for lawful independent political advocacy."   (*Id.* ¶ 18).   To further the scheme, the defendant "misused the names and tax-exempt status of purported non-profit organizations in order to convince the victims of the scheme to make large monetary donations," directing donors to send money to bank accounts "that had been opened in the name of purported non-profit organizations."   (*Id.* ¶¶ 18-19).   Rather than spend the donated funds in the manner represented to the donors, the defendant and his co-conspirators used the money to pay personal expenses, to make illegal contributions to the defendant's campaigns for public office, and to pay for trips to Africa during which the defendant attempted to solicit millions of dollars in funding for other projects.   (*Id.* ¶ 20).   The defendant concealed his diversion of the donated funds by laundering the money through numerous bank accounts, and by making false statements and representations to the FEC, the charitable donors, and the public.   (*Id.* ¶ 22).

The superseding indictment describes four specific occasions on which the defendant raised charitable and educational funds from donors pursuant to the scheme to defraud.   First, in 2010, the defendant fraudulently solicited $285,000 in charitable donations from Person A, an

elderly director of multiple charitable foundations, to a purported nonprofit entity named the Ross Center.  (*Id.* ¶¶ 23-24).  The defendant caused materially false representations to be made to Person A that the money would be used for legitimate charitable or educational purposes, including voter education in locations specified by Person A.  (*Id.* ¶ 24).  In fact, the defendant did not spend any significant portion of the donations on legitimate charitable or educational causes, instead diverting the donations to pay for a variety of personal and political expenditures that benefitted the defendant.   (*Id.* ¶ 25).

Second, in late 2011 and early to mid-2012, as the defendant campaigned for election to the U.S. House of Representatives, the defendant solicited $165,000 in additional charitable donations from Person A.   (*Id.* ¶¶ 27-28).  Once again, the defendant made materially false representations to Person A that the donations would be used for legitimate charitable or educational purposes, and the defendant used the identity of the Ross Center and another purported nonprofit entity, Life Without Limits, to raise the funds.  (*Id.* ¶¶ 28-29).  But rather than spend the $165,000 from Person A on legitimate charitable or educational expenses consistent with these entities' purported nonprofit status, as he represented to Person A, the defendant secretly diverted the money to finance his congressional campaign and to pay for a variety of personal expenditures. (*Id.* ¶ 30).

Third, in early 2013, the defendant solicited a $350,000 charitable donation from Person B to Life Without Limits, ostensibly for the purpose of funding the "Freedom House," a townhouse in Washington, D.C., that would serve as a meeting place, dormitory and training facility for young people.  (*Id.* ¶ 32).   Despite these misrepresentations to Person B, the defendant did not use any significant portion of Person B's donation to fund the Freedom House.  (*Id.* ¶ 34).   Instead, the

defendant diverted the charitable donation to pay for a variety of personal and political expenditures benefitting the defendant, including to promote the defendant's candidacy for the U.S. Senate in 2014, to conduct covert surveillance of a potential challenger in a future congressional primary election, and to benefit the defendant's family and associates. (*Id.* ¶ 34). The defendant also routed $15,000 of Person B's charitable donation to the defendant's congressional campaign account by using Posey and Dodd as conduits for the campaign contributions. The defendant caused his campaign to file a report with the Federal Election Commission (FEC) falsely stating that the contributions came from the staffers' parents, and then—following public scrutiny of the contributions—caused the campaign to file additional false reports stating that the contributions came from the staffers themselves. (*Id.* ¶¶ 35-37). To conceal his misappropriation of Person B's charitable donation, the defendant also directed Posey to send a letter to Person B's accountant in May 2014, which falsely stated that Person B's donation "allowed Life Without Limits to deliver medical supplies to third world nations and support Freedom House." (*Id.* ¶ 38).

Fourth, in 2014, as the defendant campaigned for a seat in the U.S. Senate, the defendant directed an effort to raise an additional $450,571.65 from Person B based on misrepresentations that the money would be used to finance a legitimate independent expenditure by Center for the American Future, a purported nonprofit organization created by Posey. (*Id.* ¶¶ 13, 41). In reality, the defendant personally supervised and directed the activities of Posey and Center for the American Future, which used Person B's donation to finance the mailing of hundreds of thousands of fake newspapers advocating Stockman's election to Texas voters. (*Id.* ¶¶ 42-47). Following his defeat in the March 2014 Senate primary election, the defendant caused the remainder of Person

B's donation, totaling $214,718.51, to be used to pay a variety of personal and political expenses, including debts associated with the defendant's Senate campaign.  (*Id.* ¶¶ 48-49).   In order to conceal the scheme to defraud, Posey submitted an affidavit to the FEC in May 2014, which falsely stated that "[n]either Steve Stockman, the Campaign, nor any agent of the Campaign had any material involvement or substantial discussions with me, the Center or any other officers or agents of the Center" related to Center for the American Future's production and distribution of the fake newspapers.   (*Id.* ¶ 50).

Based on the scheme described above, the superseding indictment charges the defendant with twenty-four counts.   Counts one through four of the superseding indictment charge the defendant with mail fraud, in violation of 18 U.S.C. § 1341, and counts five through eight charge the defendant with wire fraud, in violation of 18 U.S.C. § 1343.   (*Id.* ¶¶ 52-53).   Count nine of the superseding indictment charges the defendant with conspiracy to make illegal conduit contributions and false statements to the FEC, in violation of 18 U.S.C. § 371.   (*Id.* ¶¶ 54-56).   Counts ten and eleven charge the defendant with making false statements to the FEC in connection with the conduit contributions by Dodd and Posey, in violation of 18 U.S.C. § 1001(a)(2).   (*Id.* ¶¶ 57-60).   Count twelve charges the defendant with causing excessive, coordinated contributions to the defendant's 2014 U.S. Senate campaign, in violation of 52 U.S.C. §§ 30116(a)(1)(A), 30116(a)(7)(B)(i) and 30109(d)(1)(A)(i).   (*Id.* ¶ 61-62).   Counts fourteen through twenty-two and twenty-four charge the defendant with money laundering, in violation of 18 U.S.C. § 1957, and count twenty-seven charges the defendant with money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).   (*Id.* ¶¶ 65-70).   Finally, count twenty-eight charges the defendant with filing

a false tax return for the year 2013, which failed to report the income he received as a result of his scheme to defraud, in violation of 26 U.S.C. § 7206(1).   (*Id.* ¶¶ 71-72).

## II.  <u>RESPONSE TO MOTION TO DISMISS COUNTS ONE THROUGH EIGHT (R. Doc. 93)</u>

The defendant has moved to dismiss counts one through eight of the superseding indictment on the basis that these counts fail to allege an offense, that he has been prejudiced by pre-indictment delay, and that several of the counts are multiplicitous.   (*See* Defendant Stockman's Motion to Dismiss Counts 1 Through 8 (Mail and Wire Fraud) for Failure to Allege a Crime and for Multiplicity, R. Doc. 93) (hereinafter "Mot. to Dismiss Counts 1-8").   Federal Rule of Criminal Procedure 12(b) permits a defendant to raise by pretrial motion "any defense, objection, or request that the court can determine without a trial on the merits," including "a defect in the indictment."   Fed. R. Crim. P. 12(b)(3)(B).   In the Fifth Circuit, "[t]he propriety of granting a motion to dismiss an indictment . . . by pretrial motion is by-and-large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact. . . .   If a question of law is involved, then consideration of the motion is generally proper."   *United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011) (omissions in original) (internal quotation marks omitted).   However, "[a] defendant may not properly challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence, for an indictment returned by a legally constituted and unbiased grand jury, if valid on its face, is enough to call for trial of the charge on the merits."   *United States v. Mann*, 517 F.2d 259, 267 (5th Cir. 1975); *see also Costello v. United States*, 350 U.S. 359, 363 (1956).

For the reasons set forth below, counts one through eight are more than sufficient to allege violations of the mail and wire fraud statutes and are not multiplicitous.   There is also no basis to strike these counts based on pre-indictment delay.   The defendant's motion should be denied.

    A.   <u>Counts one through eight sufficiently allege that the defendant committed mail and wire fraud.</u>

The defendant first alleges that counts one through eight fail to state an offense.   (Mot. to Dismiss Counts 1-8, at 1-15).   "In reviewing a challenge to an indictment alleging that it fails to state an offense, the court is required to take the allegations of the indictment as true and to determine whether an offense has been stated."   *Fontenot*, 665 F.3d at 644.   While an indictment "must set forth the offense with sufficient clarity and certainty to apprise the accused of the crime with which he is charged," the "test for sufficiency is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimum constitutional standards."   *United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004) (internal quotation marks omitted); *see also United States v. Ramos*, 537 F.3d 439, 459 (5th Cir. 2008) ("Those minimal constitutional standards do not compel a ritual of words.   The validity of an indictment is governed by practical, not technical considerations.") (internal quotation marks omitted).   An indictment conforms to minimum constitutional standards when it "(1) contain[s] the elements of the offense charged and fairly inform[s] a defendant of the charge against which he must defend, and (2), enable[s] him to plead an acquittal or conviction in bar of future prosecutions for the same offense."   *Kay*, 359 F.3d at 742 (internal quotation marks omitted) (alteration marks in original omitted).   These requirements are more than satisfied by the detailed superseding indictment in this case.

11

i.   The scheme to defraud charged in counts one through eight is unprotected by the First Amendment.

The defendant's primary contention appears to be that the conduct charged in the indictment does not constitute an offense because it constitutes charitable fundraising activity protected by the First Amendment.   (*See* Mot. to Dismiss Counts 1-8, at 2-3).   Not so.   The indictment alleges that the defendant oversaw not a legitimate charitable fundraising effort, but rather an extensive scheme to defraud based upon lies and misrepresentations designed to deceive donors into sending hundreds of thousands of dollars to phony charities so that the defendant could divert the money for his own personal and political benefit.   The very case upon which the defendant principally relies, *Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600 (2003), makes clear that while the First Amendment "protects the right to engage in charitable solicitation," it also "does not shield fraud."   *Id.* at 611-12.   Because the indictment charges the defendant with the intentional commission of mail and wire fraud based upon material misrepresentations and false pretenses, it sufficiently alleges that he engaged in criminal activity unprotected by the First Amendment.   *See id.* at 612 ("Like other forms of public deception, fraudulent charitable solicitation is unprotected speech.").

In a series of cases in the 1980s, the Supreme Court concluded that the First Amendment prohibited states from enacting prophylactic statutes intended to combat fraud by restricting the ability of charitable fundraisers to solicit donations that would be used primarily for legitimate administrative (or "overhead") expenses.   First, in *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980), the Court struck down a municipal ordinance prohibiting the solicitation of contributions by charitable organizations that did not use at least 75 percent of their receipts for "charitable purposes," which were defined to be exclusive of salaries, commissions,

12

and administrative expenses. *See id.* at 622-24. While recognizing the municipality's "legitimate interest in preventing fraud," the Court noted that a charitable organization that spends 75 percent or more of its receipts on genuine overhead expenses is not necessarily fraudulent, since some organizations "are primarily engaged in research, advocacy, or public education and . . . use their own paid staff to carry out these functions as well as to solicit financial support." *Id.* at 636-37. Where contributions are obtained through intentional misrepresentations, however, the Court left no doubt that the government can punish such fraudulent schemes consistent with the First Amendment: "Fraudulent misrepresentations can be prohibited and the penal laws used to punish such conduct directly." *Id.* at 637.

Second, in *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947 (1984), the Court struck down a similar state statute imposing a percentage restriction on charitable solicitations, again drawing a distinction between protected "First Amendment activity that results in high costs but is itself a part of the charity's goal or that is simply attributable to the fact that the charity's cause proves to be unpopular," on the one hand, and unprotected "misdirection of funds from the organization's purported charitable goal," that is fraud, on the other. *See id.* at 966-67; *see also id.* at 967 n.16 ("[C]oncerns about unscrupulous professional fundraisers, like concerns about fraudulent charities, can and are accommodated directly, through disclosure and registration requirements and penalties for fraudulent conduct."). Finally, in *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988), the Court struck down another state law imposing prophylactic restrictions on fundraisers based on the percentage of donations that went to legitimate overhead expenses, while again emphasizing that the First Amendment does not protect fraud: "In striking down this portion of the Act, we do not suggest

13

that States must sit idly by and allow their citizens to be defrauded.   North Carolina has an antifraud law, and we presume that law enforcement officers are ready and able to enforce it."   *Id.* at 795; *see also id.* at 800 ("[T]he State may vigorously enforce its antifraud laws to prohibit professional fundraisers from obtaining money on false pretenses or by making false statements.").

In the *Madigan* case, upon which the defendant relies, the Supreme Court applied these principles to a fraud action, reversing a state court's dismissal of a complaint alleging that fundraisers defrauded members of the public by falsely representing (1) that a significant amount of the funds donated would be used for charitable purposes, when in fact only 15 percent or less of the donations would be so used, and (2) that the funds donated would "further . . . charitable purposes, when in fact the amount . . . paid over to charity was merely incidental to the fund raising effort, which was conducted primarily for the private pecuniary benefit of the fundraisers." *Madigan*, 538 U.S. at 605-06 (internal citations and quotation marks omitted) (omissions in original).   The *Madigan* Court observed that its prior decisions "took care to leave a corridor open for fraud actions to guard the public against false or misleading charitable solicitations."   *Id.* at 617.   According to the Court, "there are differences critical to First Amendment concerns between fraud actions trained on representations made in individual cases and statutes that categorically ban solicitations when fundraising costs run high."   *Id.*   While it is not sufficient merely to allege that a fundraiser has failed to disclose high fundraising costs, *id.* at 624, the Court held that "States may maintain fraud actions when fundraisers make false or misleading representations designed to deceive donors about how their donations will be used."   *Id.*; *see also id.* at 606 ("Our prior decisions do not rule out, as supportive of a fraud claim against fundraisers, any and all reliance on the percentage of charitable donations fundraisers retain for themselves.   While bare failure to

14

disclose that information directly to potential donors does not suffice to establish fraud, when nondisclosure is accompanied by intentionally misleading statements designed to deceive the listener, the First Amendment leaves room for a fraud claim.").

The superseding indictment in the present case alleges just such a scheme to deceive donors through repeated misrepresentations about how their donations would be used, and therefore sufficiently states an offense under *Madigan*.   As in *Madigan*, the superseding indictment here alleges that the defendant orchestrated a fraudulent scheme involving false representations that the funds raised would further charitable purposes, when in fact the fundraising effort was undertaken to fund personal expenses and to finance the defendant's campaigns for public office.   (*See, e.g.*, First Superseding Indictment, at ¶ 17) (describing the purpose of the scheme to defraud). Furthermore, as in *Madigan*, the federal mail and wire fraud statutes require the government to shoulder the burden of proving that the defendant defrauded the victim by intentionally making a misrepresentation of material fact—activity that is by its very nature unprotected by the First Amendment.   *See Madigan*, 538 U.S. at 620; Fifth Circuit Criminal Pattern Jury Instructions §§ 2.56, 2.57 (setting forth elements of mail and wire fraud).   The charges in this case are even less likely to impinge on First Amendment interests than the allegations in *Madigan*, since the state in *Madigan* had only to prove fraud by clear and convincing evidence, while the United States here must prove that the defendant committed fraud beyond a reasonable doubt.   *See Madigan*, 538 U.S. at 620.

The Ninth Circuit rejected a First Amendment argument analogous to the defendant's in *United States v. Lyons*, 472 F.3d 1055 (9th Cir. 2007), a case involving a similar scheme to defraud based on false representations and sham nonprofit entities.   In *Lyons*, the defendants established

15

a series of purported charities for the purpose of raising funds to be used for the defendants' personal expenses; approximately 80 percent of the funds raised were paid to the third-party telemarketers who solicited the donations, the remaining 20 percent was largely spent on the defendants' personal expenses, and virtually none of the funds raised went to charitable causes consistent with the defendants' representations to the donors.  *See id.* at 1060-62.  After they were found guilty at trial, the defendants contended on appeal that it was error under *Madigan* for the district court to admit evidence of the high proportion of funds raised that were paid as commissions to the third-party telemarketers.  *Id.* at 1064.  But the Ninth Circuit disagreed, concluding that the defendants' "undoing was not that the commissions were large but that their charitable web was a scam," and noting that "[d]onors were told their contributions went to specific charitable activities when, in reality, almost no money did."  *Id.* at 1059.

In rejecting the defendants' First Amendment claim, the *Lyons* court further observed that "[n]either *Madigan* nor the First Amendment insulates defendants from criminal prosecution for fraudulent misrepresentations about their charitable endeavors."  *Id.* at 1066.  In the present case, as in *Lyons*, "[t]he fraud is banded by the blatant misrepresentations about the charities," and "admission of evidence regarding the fundraising costs [is] essential to understanding the overall scheme and the shell game of the multiple charities."  *See id.*[1]  Like the defendants in *Lyons*, the

---

[1] This is not to say that any of the funds raised through the defendant's fraudulent scheme went to legitimate fundraising costs or overhead of the kind discussed in *Schaumburg*, *Munson*, or *Riley*. To the contrary, the indictment alleges that the defendant diverted the charitable proceeds to pay for personal expenses and to fund his campaigns for public office, not as compensation to third-party professional fundraisers for their efforts to raise additional funds for a legitimate charitable cause.  (*See, e.g.*, First Superseding Indictment, at ¶¶ 17, 20-21).  Indeed, the United States expects that the evidence will show that the defendant generally used the sham nonprofits at issue as slush funds, from which he withdrew money at will whenever a personal or political expense arose.

16

defendant here made "fraudulent misrepresentations regarding the disposition of the charitable funds," and the First Amendment poses no barrier to a fraud charge in such circumstances.   *See id.*   Put simply, there is no First Amendment right to deceive donors into donating funds to bogus charities that, in fact, are simply conduits meant to conceal the flow of the money to other purposes benefitting the person making the solicitation.   Because the superseding indictment here alleges just such a scheme, it sufficiently states an offense under the First Amendment and *Madigan*.

ii.   Counts one through eight provide sufficient notice of the charges against the defendant.

The defendant also makes a separate but related argument in support of his motion to dismiss counts one through eight, claiming that the 46-page superseding indictment "fails to allege specific facts supporting intent to defraud."   (*See* Mot. to Dismiss Counts 1-8, at 9).   As noted previously, the "minimum constitutional standards" required of an indictment are met "where the indictment alleges every element of the crime charged and in such a way as to enable the accused to prepare his defense and to allow the accused to invoke the double jeopardy clause in any subsequent proceeding."   *United States v. Dentler*, 492 F.3d 306, 309 (5th Cir. 2007) (internal quotation marks omitted).   And "so long as an indictment as a whole fairly imports an element, an exact recitation of [that] element . . . is not required."   *Id.* (internal quotation marks omitted) (omission and alteration in original).   Here, the indictment goes well beyond the required minimum constitutional standards, containing not only each element of each offense charged, but also substantial factual detail about the purpose of the scheme to defraud, (First Superseding Indictment, at ¶ 17), the manner and means of the scheme, (*Id.* ¶¶ 18-22), and the various misrepresentations and acts of concealment engaged in by the defendant in furtherance of the scheme, (*Id.* ¶¶ 23-50).   In addition, the substantive mail and wire fraud counts specify the nature

and date of each mailing and wire charged as an execution of the scheme to defraud.   (*Id.* ¶¶ 51-52).   This is more than sufficient to notify the defendant of the charges against him and to enable him to plead double jeopardy in a future proceeding.

Although the defendant couches his claim in terms of the indictment's purported failure to allege facts sufficient to meet these minimum constitutional standards, his arguments are really challenges to the indictment's *characterization* of the facts.   Indeed, the defendant spends about seven pages of his nineteen-page motion quibbling with the facts alleged in the indictment, explaining count-by-count why the indictment's allegations of fraud are, in his view, simply incorrect.   (*See* Mot. to Dismiss Counts 1-8, at 8-15).   But these matters are factual disputes to be settled by the jury, not by this Court on a pretrial motion to dismiss the indictment.   *See, e.g.*, *Kay*, 359 F.3d at 742 ("As a motion to dismiss an indictment for failure to state an offense is a challenge to the sufficiency of the indictment, we are required to take the allegations of the indictment as true and to determine whether an offense has been stated.") (internal quotation marks omitted).   The Court should reject these factual arguments masquerading as legal claims.

*Count One* — The defendant makes a number of arguments relating to count one, which charges mail fraud in connection with his fraudulent $350,000 charitable solicitation in 2013. This count, like counts two through eight, incorporates by reference the preceding paragraphs of the indictment which allege the scheme to defraud in significant detail.   It also recites each of the elements of the charged offense, alleging that, for the purpose of executing an intentionally devised scheme to defraud and to obtain money by materially false and fraudulent pretenses, representations, and promises, the defendant knowingly caused a $350,000 check from Person B's charitable foundation to be sent via mail on or about January 24, 2013.   (*See* First Superseding

18

Indictment, at ¶¶ 16, 51).   *See, e.g.*, *United States v. Traxler*, 764 F.3d 486, 488 (5th Cir. 2014) ("To prove mail fraud under 18 U.S.C. § 1341, the government must show: (1) a scheme to defraud; (2) the use of the mails to execute the scheme; and (3) the specific intent to defraud.").

Rather than explain how these allegations are insufficient to state an offense, the defendant contests the allegations themselves, citing "information shown to the Grand Jury" and arguing that his pitch to Person B "sought funds for a wide range of programs and categories of expenses," that the written proposal he provided to Person B contained budget figures showing that the Freedom House was not the only planned expenditure of the purported "Congressional Freedom Foundation," and that the $350,000 donation would only cover 27 percent of the purchase price of the Freedom House.   (Mot. to Dismiss Counts 1-8, at 6-7).[2]   These factual assertions are not a proper basis for a motion to dismiss the indictment.   The defendant may attempt to argue, if he wishes, the remarkable proposition that "[i]t is common knowledge . . . that *any* donation usually will be deposited into the general treasury fund of an organization to be used for *all* lawful purposes," regardless of any representations made to the donor.   (*Id.* at 7) (emphasis added).   The

---

[2] As the defendant is well aware, the indictment alleges that he falsely told Person B in a meeting that Person B's donation would be used to fund the Freedom House.   (First Superseding Indictment, at ¶ 32).   Regardless, even if the defendant *had* told Person B that his $350,000 charitable donation would be used to fund the Congressional Freedom Foundation more broadly, the indictment makes clear that this would still have been a material misrepresentation.   As the indictment alleges plainly and repeatedly, the purpose of the defendant's fund raising was to pay for personal expenses and to finance his campaigns for public office—not to fund legitimate charitable or educational activity.   (*See, e.g.*, *id.* ¶¶ 20, 34).   Moreover, the defendant makes much of the Congressional Freedom Foundation "budget" contained in the written proposal he provided to Person B, but he conveniently neglects to mention anything about how Person B's funds were actually spent, or how, for instance, the more than $50,000 of that charitable money used to finance the defendant's U.S. Senate candidacy constituted charitable work or a legitimate charitable "overhead" expense.   (*See id.* ¶ 34) (describing various uses of Person B's charitable donation).

government's evidence at trial will show that, to the contrary, the donors believed the defendant's intentional misrepresentations and gave money to be used for the charitable and educational purposes he described, unaware that the defendant planned to divert the money to pay for personal expenses and to finance his political ambitions.   At this juncture, however, the question is simply whether, taking the allegations in the indictment as true, the indictment sufficiently states an offense.   The detailed indictment here more than clears this hurdle.

The defendant's arguments also demonstrate a fundamental misunderstanding of the charges against him.   The indictment does not allege merely that "the $350,000 contribution from Person B was not used to buy a building called the Freedom House," as the defendant seems to claim.   (*See* Mot. to Dismiss Counts 1-8, at 6, 9).   It alleges that the defendant *intentionally defrauded* Person B and his charitable foundation based on *false pretenses* and *material misrepresentations*, namely by representing to Person B that his charitable donation would be used to fund the Freedom House, then *diverted* the funds for the defendant's own purposes and *concealed* the fraud through *false statements*.   (First Superseding Indictment, at ¶¶ 17-22, 32-39).[3] The allegation is not that the defendant merely failed to buy the house; it is that the defendant solicited charitable funds by misrepresenting that the money would go to the house, while he secretly intended to (and did) divert the money to finance personal expenses and further his

---

[3] It is therefore curious that the defendant asserts that "there are no facts alleged that funds from this nonprofit [*i.e.*, Life Without Limits] were transferred to his campaign."   (Mot. to Dismiss Counts 1-8, at 10).   To the contrary, the indictment alleges in detail that the $350,000 charitable donation was made to Life Without Limits, and then diverted in part to the defendant's congressional campaign account via conduit contributions by Dodd and Posey.   This conduct forms the basis for the conspiracy alleged in count nine.   (*See, e.g.*, First Superseding Indictment, at ¶¶ 35-37, 56).

campaigns for federal office.   That is fraud, and the indictment need allege nothing more to call for a trial on the merits.[4]

*Counts Two, Five, Six, and Seven* — These counts, which charge mail and wire fraud in relation to the defendant's defrauding of Person A in 2012, likewise allege each element of the offense and provide sufficient notice to the defendant of the misrepresentations at issue.   Each of these counts specifies that the defendant executed the scheme to defraud by causing a particular mailing or wire on a particular date.   (*Id.* ¶¶ 52-53).   The indictment also describes in detail the steps the defendant took to defraud Person A from 2010 through 2012, explaining that the defendant used the identities of two purported charities, the Ross Center and Life Without Limits, to raise hundreds of thousands of dollars from Person A through "materially false representations" that the funds would be used for legitimate charitable or educational causes.   (*See id.* ¶¶ 23-31). In reality, and as alleged in the indictment, the defendant secretly diverted the funds to finance his congressional campaign and to pay for a variety of personal expenditures.   (*Id.* ¶ 30).

The defendant complains that "there is no specific allegation that defendants intended to do anything specific other than use the donations from Person A for charitable purposes."   (Mot. to Dismiss Counts 1-8, at 10).   To the contrary, the indictment expressly states that the *entire purpose* of the scheme to defraud was for the defendant and his co-conspirators "unlawfully to enrich themselves and to fund their political activities by fraudulently soliciting and receiving

---

[4] The defendant argues in a footnote that if the donors in this case wanted to ensure that their donations went to a charitable cause, they could have made a "restricted" contribution to Life Without Limits within the meaning of the accounting standards issued by the Financial Accounting Standards Board.   (Mot. to Dismiss Counts 1-8, at 7 n.4).   This is irrelevant and beside the point; the defendant himself "restricted" the donations at issue when he falsely told the donors that they would be used for charitable and educational purposes by legitimate nonprofit entities.

hundreds of thousands of dollars in donations from charitable foundations and the individuals who ran those foundations based on false pretenses, then diverting these funds to pay for personal and political expenses and to finance illegal contributions to STOCKMAN's campaigns for federal office." (First Superseding Indictment, at ¶ 17). The indictment further alleges that, true to this purpose, the defendant misrepresented to Person A how the funds would be used and then diverted Person A's charitable donations to pay for personal and campaign expenses. (*Id.* ¶¶ 24-25, 29-30). Thus, the indictment does not allege fraud based on mere "multitasking" by the defendant. (*See* Mot. to Dismiss Counts 1-8, at 10). It alleges that the defendant stole other people's money by lying to them about how he planned to spend it. This is sufficient to state a violation of the mail and wire fraud statutes.

The defendant also claims that count five, which relates to the wire transmission to Person A of a letter from the Internal Revenue Service ("IRS") verifying the Section 501(c)(3) status of Life Without Limits, fails to allege fraud because Life Without Limits was in fact registered as a Section 501(c)(3) organization at the time. (*See id.* at 12). But there is no requirement that each mailing or wire in a fraud scheme, standing by itself, be false or misleading, and the defendant cites no authority to that effect. To the contrary, as the Supreme Court has held in the context of the mail fraud statute, "the use of the mails need not be an essential element of the scheme," and "[i]t is sufficient for the mailing to be incident to an essential part of the scheme, or a step in [the] plot." *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989) (internal quotation marks and citation omitted) (second alteration in original). "To show that a [wire] is incident to an essential part of the scheme, the government must demonstrate that completion of the alleged scheme depended in some way on the information . . . that passed through the [wire]." *United States v.*

*Dowl*, 619 F.3d 494, 499 (5th Cir. 2010) (internal quotation marks omitted) (alterations and omission in original).   Here, the transmission of the IRS letter regarding Life Without Limits was "a step in the plot" by the defendant to convince Person A that his donations would be used by Life Without Limits for legitimate charitable purposes.   No more is required.

The defendant also seeks dismissal of count six, which charges wire fraud of Person A based upon an email from the defendant to Dodd with the subject line "stan," dated May 13, 2012. (*See* First Superseding Indictment, at ¶ 53).   The defendant asserts that this count "fails to provide any nexus to this case at all, and fails to apprise Stockman of the allegation."   (Mot. to Dismiss Counts 1-8, at 13).   To the contrary, count six identifies a specific email and expressly states that the defendant transmitted that email by means of wire communication for the purpose of executing the scheme to defraud.   The defendant has been in possession of this email since at least April 24, 2017, when it was provided to him in discovery, and he is well aware of its contents.[5]   The defendant cites no authority for the proposition that the indictment must provide further information regarding a specifically identified wire transmission that was sent by the defendant to execute a scheme to defraud that is already alleged in detail in the indictment.

Finally, the defendant requests dismissal of count seven, which charges wire fraud based upon a $100,000 wire transfer from Person A's charitable foundation to Life Without Limits on July 2, 2012.   Again, the defendant fails to identify any legal deficiency in the indictment itself,

---

[5] The email from the defendant to Dodd reads: "yes, update [Person A] [.]   tell him that i [*sic*] polling in second and i will be in a run-off if everything stays the same[.]"   The United States expects that the evidence at trial will show that the defendant sent this email with the intent to raise additional funds from Person A for legitimate charitable activities, when in fact the defendant intended to divert the funds to pay for personal and campaign expenses.   Person A subsequently made a $100,000 wire transfer to Life Without Limits, and the defendant transferred a significant portion of this money to his campaign account.   (First Superseding Indictment, at ¶ 30, 53).

instead challenging the indictment's assertions of fact by claiming that the substantial portion of this charitable donation he transferred to his congressional campaign simply represented his personal "fees" as a "professional fundraiser."   (*See* Mot. to Dismiss Counts 1-8, at 13).   This is a quintessential jury argument, not a matter for the Court to decide on a motion to dismiss.   The indictment clearly alleges that the defendant caused this wire transfer as part of his scheme to defraud through intentional misrepresentations of material fact.   Far from "fail[ing] to explain how Stockman's actions were unlawful," (*id.* at 14), the indictment makes clear that the defendant raised this money by making material misrepresentations to Person A about how it would be used, then diverted the funds for his own purposes.   (*See* First Superseding Indictment, at ¶¶ 29-30).   The indictment alleges each element of the offense and provides the defendant with sufficient notice of the charged conduct.   There is no basis for dismissal.

*Counts Three and Four* — These counts allege mail fraud in connection with the defendant's fraudulent solicitation from Person B in 2014 of $450,571.65 to be used for a purported independent expenditure by Center for the American Future.   The defendant once again fails to identify any legal deficiency in these counts, instead simply arguing that the fraud charges are "undermin[ed]" by the fact that Person B's money was used in part to support the defendant's Senate candidacy.   (*See* Mot. to Dismiss Counts 1-8, at 11).   This is an argument about facts, not a basis for dismissal of the indictment.   The indictment clearly alleges that Person B donated these funds on the basis of the material misrepresentations caused by the defendant that the funds would be spent on a genuine independent expenditure, when in fact the defendant personally supervised and directed the use of Person B's donation.   (First Superseding Indictment, at ¶¶ 40-50).   The defendant may disagree with the facts alleged, but that is not a reason for dismissal.

24

*Count Eight* — Lastly, the defendant seeks dismissal of count eight, which charges the defendant with wire fraud based upon a May 13, 2014, email that the defendant directed Posey to send to Person B's accountant.   That email included a letter addressed to Person B and stating in relevant part: "[Y]our Life Without Limits achieved remarkable results this year — results I couldn't have achieved without you.   With your financial assistance of $350,000 in February 2013, allowed [*sic*] Life Without Limits, to deliver medical supplies to third world nations and support Freedom House . . . .   Your continued support is crucial to our mission."   (*Id.* ¶ 38).   The defendant makes a conclusory assertion that "there are insufficient facts to support the charges of fraud," (Mot. to Dismiss Counts 1-8, at 14), but he fails to explain why.   The indictment describes the scheme to defraud in detail, alleges each element of the offense, and alleges that the defendant caused the wire transmission at issue for the purpose of executing the scheme.   It is more than sufficient to provide the defendant with notice of the charge against him.   The defendant also again challenges the indictment's characterization of the facts, arguing (quite remarkably) that this false email "did nothing to conceal any disposition of funds."   (*Id.* at 15).   This is an argument for the jury, not a basis to dismiss the count.

B.     There is no basis to dismiss counts two, five, six, and seven due to the death of the defendant's elderly victim.

The defendant argues, with no citation to legal authority, that counts two, five, six, and seven should be dismissed due to the death of Person A prior to indictment.   (*Id.*).   Without citing any evidence that the condition of Person A had anything to do with the timing of the indictment, the defendant also accuses the United States of "having sat on these charges while a man that they knew to be in his late 80s died."   (*Id.* at 16).   These allegations are without foundation and do not provide a basis for dismissal.

A defendant seeking dismissal of an indictment based on alleged pre-indictment delay bears the burden of showing actual prejudice resulting from the delay and bad faith on the part of the government, neither of which the defendant has shown here.   In *United States v. Marion*, 404 U.S. 307 (1971), the Supreme Court held that the Sixth Amendment right to a speedy trial "has no application until the putative defendant in some way becomes an 'accused,'" that is, when a formal indictment or information is filed or the defendant is otherwise subject to arrest and holding to answer a criminal charge.   *Id.* at 313, 320.   Prior to indictment, "the applicable statute of limitations . . . is . . . the primary guarantee against bringing overly stale criminal charges."   *Id.* at 322 (internal quotation marks omitted) (omissions in original).   The Court again addressed the issue of pre-indictment delay in *United States v. Lovasco*, 431 U.S. 783 (1977), holding that "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time."   *Id.* at 796.   As the Court also noted in *Lovasco*, a rule "compelling a prosecutor to file public charges as soon as the requisite proof has been developed against one participant on one charge would cause numerous problems in those cases in which a criminal transaction involves more than one person or more than one illegal act," resulting in the impairment of legitimate investigations and burdensome multiple trials involving a single set of facts.   *See id.* at 793.   The Fifth Circuit has held, accordingly, that "for preindictment delay to violate the due process clause it must not only cause the accused substantial, actual prejudice, but the delay must also have been intentionally undertaken by the government for the purpose of gaining some tactical advantage over the accused in the contemplated prosecution or for some other impermissible, bad faith purpose."   *United States v. Crouch*, 84

F.3d 1497, 1514 (5th Cir. 1996) (en banc) (reversing the dismissal of the indictment for pre-indictment delay in a case involving the death of six potential witnesses).

Here, the defendant has presented zero evidence of bad faith delay or actual prejudice resulting from the timing of his indictment. The United States proceeded in a diligent and professional fashion throughout this investigation, and the defendant has not shown otherwise.[6] Moreover, the defendant's conclusory allegations of prejudice are insufficient to satisfy the *Crouch* standard. *See id.* at 1515 (noting that "[s]peculative prejudice does not suffice"). As the Fifth Circuit held in *Crouch*, "[a] mere loss of potential witnesses is insufficient [to demonstrate actual prejudice] absent a showing that their testimony would have actually aided the defense," and a showing that "the information . . . could not otherwise be obtained from other sources." *Id.*; *see also United States v. McGough*, 510 F.2d 598, 604 (5th Cir. 1975) (denying a motion to dismiss based on pre-indictment delay where "some six potential defense witnesses" had died and the defendant claimed that they "would have testified as to firsthand knowledge" of several of the relevant transactions).

Here, the only likely prejudice from Person A's passing is to the government, not the defense. The defendant has failed to identify any "actual, substantial prejudice" resulting from the timing of the indictment. *Cf. Crouch*, 84 F.3d at 1500 (noting that "potential prejudice" does not suffice). He claims only that Person A would have been a "primary source of exculpatory

---

[6] The defendant asserts that "upon information and belief, the FBI Agent who testified before the Grand Jury never advised the Grand Jury that Person A had died — neither during his testimony on February 28, 2017, nor his testimony on March 28, 2017." (Mot. to Dismiss Counts 1-8, at 15). The defendant is mistaken. During the testimony of the agent at issue on February 28, 2017, the agent expressly advised the grand jury that Person A had recently passed away. The defendant was provided with the transcript of this testimony on April 24, 2017, six months before he filed this motion.

evidence." (Mot. to Dismiss Counts 1-8, at 16). To the contrary, the United States expects that the written statements of Person A during the relevant period of time will make clear that the defendant well understood that Person A believed that he was providing funds to the defendant to be used for charitable and educational purposes. Person A would have been a government witness and would have provided substantial inculpatory information at trial. *See McGough*, 510 F.2d 598, 604 (reversing the district court's dismissal of the indictment for pre-indictment delay, noting among other things that the government expected two of the six deceased witnesses to be government witnesses, rather than witnesses for the defense, at trial).

In any event, any prejudice to the defendant resulting from Person A's death is obviated by the fact that the defendant's fraudulent representations to Person A were often contained in writing, in materials that have been provided to the defendant in discovery. The defendant is also in possession of written communications from Person A concerning the charitable donations at issue. The United States also expects that Dodd, who was present in many discussions with Person A, and Person A's personal assistant, who was involved in transmitting many of the communications at issue to Person A, may be called as witnesses at trial, and the defendant would be free to cross-examine them regarding any relevant issues. The defendant thus has other avenues to pursue in order to probe the nature of the communications between the defendant and Person A.

In short, the defendant has set forth no evidence to establish bad faith or actual prejudice, and his conclusory assertions are insufficient to justify dismissal of the indictment. His motion should be denied.

C.     Counts one through five and eight are not multiplicitous.

Finally, the defendant contends that counts one through five and eight are multiplicitous. (Mot. to Dismiss Counts 1-8, at 16-18).   "An indictment is multiplicitous if it charges a single offense in multiple counts, thus raising the potential for multiple punishment for the same offense, implicating the [F]ifth [A]mendment double jeopardy clause."   *United States v. Reagan*, 596 F.3d 251, 253 (5th Cir. 2010) (internal quotation marks omitted) (alterations in original).   The Fifth Circuit has observed that there are "at least two species of multiplicity challenges":

> The first type arises when a defendant is charged with violating two different statutes, one of which is arguably the lesser included offense of the other.   This is the species of multiplicity challenge addressed in *Blockburger v. United States*, 284 U.S. 299 (1932), and its progeny.   Unless each offense requires proof of an element that the other does not, a defendant may not be charged with both.   The second type of multiplicity challenge arises when charges for multiple violations of the same statute are predicated on arguably the same criminal conduct.   In that circumstance, the court inquires whether separate and distinct prohibited acts, made punishable by law, have been committed.

*United States v. Woerner*, 709 F.3d 527, 539 (5th Cir. 2013) (internal quotation marks and citations omitted).   The defendant appears to contend that the indictment contains both forms of multiplicity, and each of his arguments is addressed below.

*Counts One and Eight* — The defendant contends that there is multiplicity between count one, which charges mail fraud based on the mailing of the $350,000 charitable donation check from Person B in 2013, and count eight, which charges wire fraud based on the transmission of the 2014 letter to Person B's accountant falsely stating that the donated funds were used to support the Freedom House.   (Mot. to Dismiss Counts 1-8, at 16-18).   Given the defendant's contention that the indictment is multiplicitous because it alleges violations of two different statutes, the question is whether "each offense requires proof of an element that the other does not."   *Woerner*,

709 F.3d at 539.   That is clearly the case here, since a violation of the mail fraud statute requires that the defendant execute the scheme by causing a mailing, and a violation of the wire fraud statute requires that the defendant execute the scheme by causing an interstate wire transmission.   *See* Fifth Circuit Criminal Pattern Jury Instructions §§ 2.56, 2.57 (setting forth elements of mail and wire fraud); *see also United States v. Tartaglione*, 228 F. Supp. 3d 455, 463 (E.D. Pa. 2017) (rejecting a motion to dismiss the indictment on multiplicity grounds, noting that "[b]ecause mail and wire fraud require the proof of different elements, that is, use of the mails and use of interstate wire communications in furtherance of the scheme, they too have different elements").

The defendant asserts that counts one and eight are multiplicitous because they "relate to a single charitable donation given in response to one solicitation," but this is not the test for multiplicity.   Defendants routinely commit multiple crimes in connection with the same series of events.   The question on a multiplicity challenge is whether the crimes alleged each require proof of an element that the other does not, and the mail and wire fraud statutes easily satisfy this test. *See, e.g.*, *United States v. Langford*, Order and Recommendations, 2009 WL 10671369, at *5 (N.D. Ala. July 2, 2009) ("Mail fraud and wire fraud are also separate offenses.   Each requires elements of proof that the other does not. . . .   Separate charges of wire fraud and mail fraud are not multiplicitous to each other . . . ."), *adopted by United States v. Langford*, Order, 2009 WL 10671793 (N.D. Ala. July 28, 2009).[7]

---

[7]  The fact that the letter to Person B's accountant was mailed in 2014, after Person B had provided the $350,000 charitable donation at issue, is no bar to count eight, since the scheme to defraud was ongoing at the time of the 2014 letter and that letter was designed to conceal the misappropriation of the charitable funds.   *See, e.g.*, *United States v. Ashdown*, 509 F.2d 793, 800 (5th Cir. 1975) ("[P]ost-purchase mailings which are designed to lull the victim into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect are mailings in furtherance of the scheme.").

*Counts Two and Five* — The defendant similarly argues that counts two and five are multiplicitous because they allege mail and wire fraud "relate[d] to the same transaction." (*See* Mot. to Dismiss Counts 1-8, at 18). This argument fails for the same reason that counts one and eight are not multiplicitous: mail and wire fraud each require proof of an element that the other does not, and they thus constitute separate criminal offenses.

*Counts Three and Four* — The defendant also challenges as multiplicitous counts three and four, each of which alleges mail fraud in connection with Person B's $450,571.65 donation in 2014. (*Id.*). Count three charges that the defendant executed the scheme to defraud by causing the mailing of a letter to Person B on or about February 17, 2014, and count four charges that the defendant executed the scheme to defraud by causing Person B to mail a check for $450,571.65 on or about February 18, 2014. (First Superseding Indictment, at ¶ 52). The defendant claims that these counts are multiplicitous because they "relate to a single transaction," (Mot. to Dismiss Counts 1-8, at 18), but that is not the relevant legal test. Because the defendant asserts as multiplicitous two alleged violations of the same statute, the question is "whether separate and distinct prohibited acts, made punishable by law, have been committed." *Woerner*, 709 F.3d at 539.

It is well-established that for purposes of the mail and wire fraud statutes, *each* mailing or wire in execution of a single scheme is a separate criminal offense. The Fifth Circuit has observed that "[i]t has been held many times under the mail fraud statute, 18 U.S.C. § 1341, that each separate use of the mails constitutes a separate offense," and that "[t]he same principle of construction should apply and has been applied to the wire fraud statute." *Sibley v. United States*, 344 F.2d 103, 105 (5th Cir. 1965); *see also Henderson v. United States*, 425 F.2d 134, 138 n.4 (5th

31

Cir. 1970).   Other circuits have reached the same conclusion.   *See, e.g.*, *United States v. Jefferson*, 674 F.3d 332, 367 (4th Cir. 2012) ("In a mail or wire fraud prosecution, the mailing or wire transmission itself — i.e., misuse of the mail or wire — has consistently been viewed as the *actus reus* that is punishable by federal law.   In such prosecutions, it is settled that each mailing or wire transmission in furtherance of the fraud scheme constitutes a separate offense, and it may be separately punished.") (footnote omitted); *United States v. Williams*, 527 F.3d 1235, 1241 (11th Cir. 2008) ("Where one scheme or artifice to defraud involves multiple wire transmissions, each wire transmission may form the basis for a separate count."); *United States v. Garlick*, 240 F.3d 789, 793 (9th Cir. 2001) ("In both the mail and wire fraud contexts, courts have consistently recognized Congress' intent, repeatedly holding each use of the mails or wires to be a discrete offense."); *United States v. Gardner*, 65 F.3d 82, 85 (8th Cir. 1995) ("Under 18 U.S.C. § 1341, it is not the plan or scheme that is punished, but rather each individual use of the mails in furtherance of that scheme.   Accordingly, the separate instances of mailings in furtherance of the alleged fraud . . . are separately prosecutable despite the presence of only one general scheme.") (internal citations omitted); *United States v. Luongo*, 11 F.3d 7, 9 (1st Cir. 1993) ("It is well established that each use of the wires constitutes a separate crime under 18 U.S.C. § 1343, even if the several uses are in pursuance of but one criminal enterprise.") (internal quotation marks omitted); *United States v. Alston*, 609 F.2d 531, 535-36 (D.C. Cir. 1979) ("The mail and wire fraud statutes prescribe a penalty for [e]ach use of the mails or wires 'for the purpose of executing' a scheme to defraud or to obtain money or property by means of false pretenses.") (footnotes omitted).   Furthermore, counts three and four do not constitute the same offense because "each charge of mail fraud

32

requires proof of an additional fact which the other does not, namely the use of the mails specified for each particular count." *See Gardner*, 65 F.3d at 86.

The defendant has not offered any authority to support his claim of multiplicity on counts three and four, and his claim is foreclosed by clearly established precedent holding that each mailing or wire for the purpose of executing the fraudulent scheme is a separate criminal offense. His arguments are meritless and his motion should be denied.

## III.   RESPONSE TO MOTION TO DISMISS COUNTS NINE THROUGH ELEVEN (R. Doc. 94)

The defendant moves to dismiss counts nine through eleven of the superseding indictment on the basis that these counts fail to allege an offense.  (*See* Defendant Stockman's Motion to Dismiss Counts 9 Through 11 of the Indictment (Conspiracy and False Statements) for Failure to Allege a Crime, R. Doc. 94) (hereinafter "Mot. to Dismiss Counts 9-11").   Because counts nine through eleven properly allege the elements of the offenses and provide fair notice of the crimes charged, the defendant's motion should be denied.

### A.   Count nine properly alleges that the defendant engaged in a conspiracy to make conduit contributions and false statements.

Count nine of the First Superseding Indictment charges the defendant with conspiracy to commit two federal offenses: making conduit contributions, in violation of 52 U.S.C. §§ 30122 and 30109(d)(1)(D), and causing the defendant's campaign to file a false statement with the FEC, in violation of 18 U.S.C. § 1001(a)(2).   The defendant seeks dismissal of count nine, claiming that the indictment fails to charge a conspiracy to violate 52 U.S.C. § 30122 of the Federal Election

Campaign Act of 1971 ("FECA").[8]

18 U.S.C. § 371 makes it unlawful for two or more persons to conspire to commit an offense against the United States and one or more of such persons to do an act to effect the object of the conspiracy. *United States v. Nowlin*, 640 F. App'x 337, 342 (5th Cir. 2016) (unpublished).[9] In addition to proving an intent to further an unlawful objective of the conspiracy, the United States must also prove the defendant acted willfully, that is with the specific intent to further the unlawful purpose. *United States v. Njoku*, 737 F.3d 55, 64 (5th Cir. 2013); *United States v. U.S. Gypsum Co.*, 438 U.S. 422 n. 20 (1978) (identifying two types of intent needed to prove conspiracy: "the basic intent to agree, which is necessary to establish the existence of the conspiracy, and the more traditional intent to effectuate the object of the conspiracy").

Both objects of the count nine conspiracy relate to violations of FECA. The passage of FECA sought to remedy corruption of the political process by, among other things, imposing recordkeeping and disclosure requirements on federal candidates. In particular, the disclosure provisions require the reporting of contributions and expenditures for the purpose of influencing any election for federal office. The FEC was established to administer and enforce the legislation.

The Supreme Court has determined that FECA's contribution and general disclosure provisions are constitutional. *See generally Buckley v. Valeo*, 424 U.S. 1, 11-86 (1976) (per curiam). *Buckley* found that the contribution provisions, together with the provisions covering disclosure, are appropriate controls in preventing corruption and the appearance of corruption

---

[8] The defendant's motion only claims that the first object of the conspiracy is improperly alleged, meaning that if his motion were successful, count nine would remain.

[9] Unpublished cases from this circuit "are not controlling precedent, . . . [but] may be considered persuasive authority." *United States v. Johnson*, 619 F.3d 469, 473 n.3 (5th Cir. 2010); 5th Cir. R. 47.5.4.

stemming from the dependence of candidates on large campaign contributions.   These controls serve the governmental interest in safeguarding the integrity of the federal electoral process without directly impinging upon the rights of citizens and candidates to free expression and association.   *Id.*   The Court identified three categories of governmental interests served by the disclosure requirements of FECA:

> First, disclosure provides the electorate with information 'as to where political campaign money comes from and how it is spent by the candidate' in order to aid the voters in evaluating those who seek federal office. It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches. The sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office.

> Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity. This exposure may discourage those who would use money for improper purposes either before or after the election.   A public armed with information about a candidate's most generous supporters is better able to detect any post-election special favors that may be given in return.   And, as we recognized in *Burroughs v. United States*, Congress could reasonably conclude that full disclosure during an election campaign tends 'to prevent the corrupt use of money to affect elections.' In enacting these requirements it may have been mindful of Mr. Justice Brandeis' advice: 'Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.'

> Third, and not least significant, recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations described above.

*Id.* at 66-68 (internal citations omitted).

The contribution and disclosure requirements of FECA include the prohibitions against making or causing to be made contributions to a candidate for federal office in the names of other persons, as well as misrepresenting the true source of the contribution in the disclosure reports to the FEC.   Paragraph 55(a) of count nine alleges as the first object of the conspiracy the knowing

and willful making of contributions to a candidate for federal office in the names of other persons, aggregating to more than $10,000 in a calendar year, in violation of 52 U.S.C. §§ 30122 and 30109(d)(1)(D).

The defendant's contention that the allegations in paragraph 55(a) are insufficient is without merit.   The superseding indictment alleges the essential elements of the offense and additional particulars are set out in the overt acts as well as in paragraphs 1 through 53, incorporated by reference.   Count nine fairly informs the defendant of the nature of the charge so that he may prepare a defense.   Further, sufficient specificity is alleged in count nine enabling the defendant to invoke the Double Jeopardy Clause should a separate prosecution be brought based on the same conduct.

The defendant claims the allegations in paragraph 55(a) are insufficient absent an explicit allegation that the funds, which were the subject of the campaign contributions, were not the property of the named contributor.   He argues the indictment must specifically state he provided the funds to Posey and Dodd "for the purpose of making contributions to his campaign" and that "the funds donated to Stockman's campaign by Posey and Dodd were not the legal property of Posey and Dodd at the time the contributions were made."   (Mot. to Dismiss Counts 9-11, at 2-3).

This claim is an attempt to litigate a factual issue through a legal motion.   Importantly, it has been repeatedly rejected.   Section 30122 is violated even when a straw donor contributes with his or her funds, when the donation is made with the understanding the defendant would reimburse the straw donor after the contribution was made.  *United States v. O'Donnell*, 608 F.3d 546 (9th Cir. 2010); *United States v. Hopkins*, 916 F.2d 207 (5th Cir. 1990) (affirming defendants'

convictions where defendants' employees made political contributions and the defendants reimbursed their employees for their contributions by providing their employees pay raises or in payments for legitimate business expenses).   In *United States v. Whittemore*, 776 F.3d 1074 (9th Cir. 2015), the defendant sought a jury instruction that an unconditional gift of funds cannot violate the conduit contribution statute if the funds have become the property of the donors under Nevada law.   The defendant argued on appeal that the money he transferred to his relatives and employees became their own money and, because the transfer was not conditioned upon the making of campaign contributions, the subsequent contribution could not as a matter of law trigger a violation of FECA.   The Ninth Circuit disagreed.

The defendant's objections to count nine are but a thinly veiled attempt to set the stage for his defense and requested jury instructions.   The alleged deficiencies in the indictment simply do not exist.   Most importantly, the indictment explicitly provides notice to the defendant as to the allegations: the defendant obtained $350,000 by fraudulent means, from those funds he provided Dodd and Posey the money to contribute to his campaign, and the campaign filed a report falsely attributing the contributions.

The proscribed conduct in § 30122 is the "making of a contribution in the name of another person."   Implicit in the language of the statute, and explicit in the indictment, is that the named contributor was not the true source of the money used for the contribution.   Paragraph 35 of the indictment describes the diversion of a portion of the fraudulently obtained $350,000 into two checks written on the defendant's Life Without Limits bank account made payable to Posey and Dodd.   This paragraph further states the two Life Without Limits checks were deposited into Posey's and Dodd's personal bank accounts.   Paragraph 36 describes Posey and Dodd each

writing three checks to the defendant's campaign using the funds described in paragraph 35, and further states those checks were then deposited into his campaign account.   Paragraph 37 details that the six contribution checks written on Posey's and Dodd's accounts were falsely attributed as contributions being made by Posey's father and Dodd's mother.   (First Superseding Indictment, at ¶¶ 37, 56(i)-(j)).   Ultimately the FEC report naming Posey's father and Dodd's mother as the contributors was twice amended to name Posey and Dodd.

A common sense reading of all the allegations in the indictment related to count nine confirms the indictment is more than sufficient.   "An indictment's sufficiency is determined by an examination of its specific language, taking account of the indictment as a whole in the context of its statutory background."   *United States v. Gonzales*, 436 F.3d 560, 569 (5th Cir. 2006) (citing *United States v. Haas*, 583 F.2d 216 (5th Cir. 1978)); *McGough*, 510 F.2d at 602-03 (ruling that failure to explicitly allege materiality in the indictment did not render the indictment fatally insufficient since the facts alleged in the indictment warranted an inference that the false statement was material).

Although a single conspiracy is alleged in count nine, it is the defendant's position that each overt act relates only to one or the other of the objects of the conspiracy, but not both. The defendant's argument centers on his theory that the conspiracy to violate § 30122 was over at the point the contribution checks were provided to the campaign and therefore none of the overt acts beyond that date can be considered in evaluating the sufficiency of the indictment. The Defendant's argument ignores the fact that the contribution and disclosure requirements of FECA go hand in hand.   Implicit in the criminal act of making a political contribution in the name of another is that the source of the contribution will be misreported.   The defendant's reading of the

conspiracy alleged in count nine is too narrow.   *United States v. Girard*, 744 F.2d 1170 (5th Cir. 1984) (observing that the bid rigging conspiracy did not end with the award of the contract and the crime was not complete until the scheme was complete); *United States v. Faulkner*, 17 F.3d 745, 760 (5th Cir. 1994) (declaring that the government may prove the existence of a single agreement among defendants by showing that "the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect . . . or to the overall success of the venture") (internal quotation marks omitted).

       B.    <u>Counts ten and eleven properly allege that the defendant caused false statements to the FEC.</u>

Counts ten and eleven allege violations of 18 U.S.C. § 1001.  The defendant claims, however, that these counts either fail to allege the making of a conduit contribution, fail to allege materiality, or "are so factually and legally convoluted" they fail to put him on notice of the charges, and therefore should be dismissed.

Title 18 U.S.C. § 1001(a)(2) makes it a crime "to make any false or fraudulent statement in any matter within the jurisdiction of a federal agency."   *United States v. Yermian*, 468 U.S. 63, 64 (1984) (observing that the government must prove the statement was made with knowledge of its falsity but is not required to prove the statement was made with actual knowledge of federal agency jurisdiction).   Required proof at trial for a § 1001(a)(2) conviction is "'(1) a statement, (2) falsity, (3) materiality, (4) specific intent, and (5) agency jurisdiction.'"   *United States v. Richardson*, 676 F.3d 491, 504 (5th Cir. 2012) (quoting *United States v. Elashyi*, 554 F.3d 480, 497 (5th Cir. 2008)).   Counts ten and eleven allege each of these elements.

The defendant's motion to dismiss these counts offers the defendant's trial theories disguised as challenges to the facial validity of the indictment.   The defendant's posturing first

seeks to limit artificially the scenarios in which a contribution may be construed as a conduit contribution.   Specifically, the defendant argues that an FEC statement reflecting contributions from a source cannot be false, if the true source could have lawfully made the contribution in his or her own name, but instead attributed the contribution in the name of another.   The defendant provides no legal authority for his assumptions, and none exists.   Further, his reasoning disregards the allegation in both counts that the funds he funneled into his campaign account were fraudulently obtained.

In addition, the defendant weaves into this framework his bald assertion that the indictment does not allege materiality.  *United States v. Harms*, 442 F.3d 367 (5th Cir. 2006) (observing whether a misstatement is material is generally an issue of fact for the jury to decide as long as indictment contains a facially sufficient allegation of materiality); *United States v. Baker*, 626 F.2d 512 (5th Cir. 1980) (noting that the purpose of the materiality requirement of §1001 is to exclude trivial falsehoods from the purview of the statute).   Given the fact the false statements regarding the source of the contributions strike at the core goals of FECA, the misrepresentations were not trivial.   As the Supreme Court noted in *Buckley*, "recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations."   424 U.S. at 67-68.   Congress established the FEC to protect the integrity of the federal electoral process through the administration and enforcement of FECA. The misrepresentations regarding the source of the contributions was material to the FEC's determination of whether the contributions were prohibited under FECA.   *United States v. Gaudin*, 515 U.S. 506, 512 (1995).

The Court must take as true the allegations of the indictment when reviewing a challenge

40

alleging that it fails to state an offense.   *Fontenot*, 665 F.3d at 644.   The allegations in counts nine, ten, and eleven are plain, concise, and definite written statements of the essential facts constituting the offense charged, Fed. R. Crim. P. 7(c)(1), which allow the defendant to prepare a defense and invoke the Double Jeopardy Clause in the event of a separate prosecution based on the same conduct.

## IV.   RESPONSE TO MOTION TO DISMISS COUNT TWELVE (R. Doc. 92)

The defendant moves to dismiss count twelve of the superseding indictment for failing to allege a crime, for "unconstitutional statutory and regulatory vagueness," and for violating "protected speech and press rights."   (Defendant Stockman's Motion to Dismiss Count 12 (Making Excessive Contributions) For Failing to Allege a Crime and For Unconstitutional Statutory and Regulatory Vagueness, R. Doc. 92, at 1-2) (hereinafter "Mot. to Dismiss Count 12"). These arguments are without merit.   Count twelve properly charges the defendant with violating the longstanding, clearly defined prohibition against making excessive campaign contributions through "coordination," and the superseding indictment alleges the essential elements of that offense in the language of the statute.   Further, because the statute defining coordination "delineates its reach in words of common understanding," and provides "fair notice to those to whom it is directed," *McConnell v. FEC*, 540 U.S. 93, 222-23 (2003) (internal citations omitted), *overruled in part on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010), the statute is not void for vagueness.

### A.   The longstanding prohibition against illegal coordination is foundational to the federal campaign finance system.

Since its inception, FECA has distinguished between campaign "contributions" directed to a candidate (or the candidate's authorized committee), and "expenditures" made by persons or

organizations to influence a federal election.  *See generally Buckley*, 424 U.S. at 13-23.   These two fundamental categories of campaign activity have also received different First Amendment scrutiny in the courts.  *See FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 437 (2001) (*Colorado II*) (collecting cases).   Campaign "contributions," are generally viewed as a form of indirect or symbolic speech that involve "speech by someone other than the contributor." *Buckley*, 424 U.S. at 21.   Because limits on contributions "involve[] little direct restraint" on the contributor's "political communication," restrictions on contribution amounts are subject to less rigorous First Amendment review.  *Id.*  "Expenditures," by contrast, involve direct forms of speech by the person or organization making the expenditure, as "virtually every means of communicating ideas in today's mass society requires the expenditure of money."  *Id.* at 19. Limitations on "expenditures" therefore "impose significantly more severe restrictions on protected freedoms of political expression and association," and receive heightened scrutiny under the First Amendment.  *Id.* at 23.[10]

Given this distinction, over the years courts have generally upheld limits on "contributions" to federal candidates and their campaigns.  *See Buckley*, 424 U.S. at 29 (upholding $1,000 "contribution ceiling" for contributions to candidates and their campaign committees); *McConnell*, 540 U.S. at 133-88 (upholding various prohibitions on "soft money" contributions); *see also McCutcheon v. FEC*, 134 S.Ct. 1434, 1451 (2014) (striking down aggregate contribution limits,

---

[10] The Supreme Court has articulated "[a] further reason for the distinction [between contributions and expenditures]," namely, "that limits on contributions are more clearly justified by a link to political corruption than limits on other kinds of unlimited political spending are (corruption being understood not only as *quid pro quo* agreements, but also as undue influence on an officeholder's judgment, and the appearance of such influence)."  *Colorado II*, 533 U.S. at 440–41.   The Supreme Court was quick to caution, however, that this distinction exists only insofar as "the spending is not coordinated with a candidate or his campaign."  *Id.*

but leaving the "base limits undisturbed," as "the primary means of regulating campaign contributions"). In fact, the Supreme Court has recognized that campaign contribution limits are essential to "limit the actuality and appearance of corruption resulting from large individual financial contributions," which if left unchecked could "erode[] to a disastrous extent" the citizenry's "confidence in the system of representative Government." *See Buckley*, 424 U.S. at 26 (internal quotation marks omitted). Legislative restrictions on "expenditures," however, have not been viewed as favorably. *See id.* at 51 (striking down $1,000 cap on independent expenditures by individuals); *Citizens United*, 558 U.S. at 365-66 (striking down dollar caps on independent expenditures by corporations and labor unions from general treasury funds).

In the wake of the Supreme Court's decision in *Citizens United* in 2010, individuals, corporations, and other organizations are generally free to spend unlimited amounts of money—*i.e.* make expenditures—to influence a federal election. At the same time, federal law limits the amount of contributions that individuals can provide to federal candidates and their authorized committees (currently, $2,700 per election), while corporations are entirely prohibited from making contributions with general treasury funds.

The potential loophole in this framework is apparent. If a federal candidate has a large campaign expense—printing campaign signs at a cost of $270,000, for example—the candidate has two potential financing options: (1) secure 100 individual maximum "contributions" to his campaign at $2,700 each, then use the campaign funds to pay for the signs; or (2) help a third party unconnected to the campaign secure a single donation of $270,000 for an "expenditure," then direct the third party to make the "expenditure" to pay for the signs. The second option would involve substantially less time and resources—securing 1 donation versus 100 separate contributions—but

43

would also render FECA's contribution limits meaningless.   A federal candidate could do an end-run around the well-established campaign contribution limits merely by causing donors to make the candidate's desired campaign expenditure from their own accounts, in a manner personally supervised and directed by the candidate.

To prevent such wholesale erosion of the contribution limits and to preserve the basic framework of the campaign finance system, FECA has always treated expenditures that are "coordinated" with a candidate as contributions, subject to FECA's contribution limits.   *Buckley*, 424 U.S. at 46-47 ("[C]ontrolled or coordinated expenditures are treated as contributions rather than expenditures under the Act.   [FECA's] contribution ceilings rather than [the] independent expenditure limitation prevent attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions."); *Colorado II*, 533 U.S. at 438 ("Expenditures coordinated with a candidate . . . are contributions under the Act.").

The Supreme Court has repeatedly emphasized the importance of restrictions on coordinated expenditures as a foundational principle of campaign finance law.   *See, e.g.*, *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 498 (1985) (explaining that "the absence of prearrangement and coordination undermines the value of the expenditure to the candidate, and thereby alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate"); *Colo. Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 617 (1996) (*Colorado I*) (plurality opinion) (observing that "the constitutionally significant fact . . . is the lack of coordination between the candidate and the source of the expenditure"); *Colorado II*, 533 U.S. at 446 ("The idea was that coordinated expenditures are as useful to the candidate as cash, and that such 'disguised contributions' might be given 'as a *quid*

44

*pro quo* for improper commitments from the candidate' (in contrast to independent expenditures, which are poor sources of leverage for a spender because they might be duplicative or counterproductive from a candidate's point of view).") (internal citation omitted).

FECA implements the prohibition on excessive campaign contributions by "coordination" in a straightforward statutory definition: expenditures made "in cooperation, consultation, or concert with, or at the request or suggestion" of a candidate, are considered "contributions" to the candidate subject to FECA's contribution limits.   *See* 52 U.S.C. § 30116(a)(7)(B)(i); 52 U.S.C. § 30116(a)(1)(A).   Thus, when a candidate and a third party knowingly and willfully engage in a coordinated expenditure that exceeds the contribution limits, they are subject to criminal liability for making or causing an excessive campaign contribution.   *See* 52 U.S.C. § 30109(d)(1)(A)(i).

> B.   <u>Count twelve of the superseding indictment alleges the essential elements of making an excessive campaign through coordination in the language of the statute.</u>

As discussed above, an indictment satisfies minimum constitutional standards when it alleges the elements of the offense and fairly informs the defendant of the charge against him. "Generally, an indictment that closely tracks the language under which it is brought is sufficient to give a defendant notice of the crimes with which he is charged."   *United States v. Franco*, 632 F.3d 880, 884 (5th Cir. 2011).

Count twelve of the superseding indictment satisfies this standard by alleging the elements of coordination in the language of the statute.   As noted above, the statutory language provides that, "expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate."   52 U.S.C. § 30116(a)(7)(B)(i).   Count twelve

tracks this language with precision, alleging that the defendant caused expenditures by Center for the American Future "in cooperation, consultation, and concert, with, and at the request and suggestion of, STOCKMAN, his authorized political committee, and their agents." (First Superseding Indictment, at ¶ 62). Consistent with the statute, count twelve also alleges the proper *mens rea* element for the offense. *Compare* 52 U.S.C § 30109(d)(1)(A)(i) (imposing criminal liability on "[a]ny person who knowingly and willfully commits a violation of any provision of this Act"), *with* (First Superseding Indictment, at ¶ 62) (charging the defendant with "knowingly and willfully" causing an excessive campaign contribution through coordination).

In addition to charging the offense of making excessive campaign contributions by coordination in the language of the statute, the superseding indictment provides additional notice to the defendant through detailed factual allegations of the defendant's acts of coordination. Specifically, the indictment charges that the defendant, in connection with his campaign for the United States Senate, commissioned the creation of a fake newspaper that advocated for the defendant and against his opponent. (First Superseding Indictment, at ¶ 40). Rather than financing the campaign publication through individual contributions—which, at the time, were limited to $2,600 per election (*id.* ¶ 5(a))—the defendant and his co-defendant, Jason Posey, developed a plan to finance the project through a purported independent expenditure by Center for the American Future, a nonprofit organization Posey had created. (*Id.* ¶¶ 13, 41).

The superseding indictment goes on to detail the specific steps the defendant took in coordination with Posey and Center for the American Future on the expenditure for the purported newspapers. The defendant, for example, directed a third party to send a solicitation to Person B requesting over $450,000 to finance Center for the American Future's distribution of more than

800,000 copies of the "newspaper."  (*Id.* ¶ 45.)   The defendant and Posey also "coordinated with two direct-mail companies to deliver hundreds of thousands of copies of the 'newspaper' . . . for distribution to voters."  (*Id.*)   In addition, "while the 'newspaper' was being processed for distribution," the defendant and Posey "jointly supervised the mass-mailing project."  (*Id.* ¶ 47.) The superseding indictment also charges that, during this period of time, "Posey . . . remained involved in [the defendant's] Senate campaign."  (*Id.*)

In short, the superseding indictment alleges that Posey and Center for the American Future were nothing more than an arm of the defendant and his campaign, with the expenditure for the mass-mailing project occurring in "cooperation, consultation, and concert with, and at the request and suggestion of" the defendant—all in an effort to circumvent FECA's contribution limits. Count twelve properly alleges the essential elements of coordination in the language of the statute and gives ample notice to the defendant of the crime with which he is charged.

Notwithstanding the substantial notice of the charge provided in the superseding indictment, the defendant argues that count twelve is defective because it fails to allege a discrete regulatory provision from the Code of Federal Regulations.

This argument misses the mark.   The superseding indictment does not charge the defendant with violating an administrative regulation; it charges him with violating the prohibition on excessive campaign contributions through coordination under Title 52, United States Code, Section 30116.   Unlike some statutes, nothing in FECA's penalty section predicates criminal liability on a violation of a regulatory provision.   *Compare* 52 U.S.C. § 30109(d)(1)(A) (imposing criminal liability in the FECA context on "[a]ny person who knowingly and willfully commits a violation of any provision of *this Act*") (emphasis added), *with* 15 U.S.C. § 78ff (imposing criminal

liability for securities fraud on "[a]ny person who willfully violates any provision of this chapter . . . *or any rule or regulation thereunder* the violation of which is made unlawful or the observance of which is required under the terms of this chapter) (emphasis added).   Nor does the defendant cite any criminal case under FECA that requires the government to allege as an element in the indictment an administrative regulation promulgated by the FEC.   The defendant's lengthy analysis of the administrative regulations and the FEC's advisory opinions is therefore beside the point.

In addition to wrongly assuming that the administrative regulations supply the elements for the coordination charge, the defendant's motion also asserts that count twelve attempts to satisfy the "content" prong of the FEC's administrative test by alleging "express advocacy."   Not so. While not required, the superseding indictment alleges facts that would satisfy the FEC's "content" prong, 11 C.F.R. § 109.21(c), in at least three ways.   First, the mass-mailing project alleged in count twelve qualifies as a "public communication . . . that disseminates, distributes, or republishes, in whole or in part, campaign materials prepared by a candidate or the candidate's authorized committee."   (S*ee* First Superseding Indictment, at ¶¶ 40, 47).   Second, the expenditure on the mass-mailing qualifies as a "public communication" that "refers to a clearly identified . . . Senate candidate and is publicly distributed or otherwise publicly disseminated in the clearly identified candidate's jurisdiction 90 days or fewer before the clearly identified candidate's . . . primary . . . election." (S*ee id.* ¶¶ 40, 47, 49, 62).   Third, the expenditure was for a "public communication" that was "the functional equivalent of express advocacy," meaning that the "newspaper" was "susceptible of no reasonable interpretation other than as an appeal to vote for or against a clearly identified Federal candidate." (See id. ¶¶ 40, 62).   The Court need not

reach any of these issues, however, because the elements for coordination come from Title 52 of the United States Code, not from the FEC's administrative regulations.

At most, the administrative regulations may be relevant to a "good faith" defense at trial, where the jury would determine whether any purported reliance on the regulations by the defendant negates his willfulness.  *See* 52 U.S.C. § 30111(e) ("Notwithstanding any other provision of law, any person who relies upon any rule or regulation prescribed by the Commission in accordance with the provisions of this section and who acts in good faith in accordance with such rule or regulation shall not, as a result of such act, be subject to any sanction provided by this Act or by chapter 95 or chapter 96 of Title 26."); *see also United States v. Simkanin*, 420 F.3d 397, 410 (5th Cir. 2005) (noting that "a defendant's good-faith belief that he is acting within the law negates the willfulness element").   The government, however, is not required to plead the absence of a possible defense in the indictment.  *United States v. Webb*, 747 F.2d 278, 284 (5th Cir. 1984) (observing that "an indictment is not defective merely because it fails to anticipate and negative a possible defense").   Instead, "the indictment must allege each and every *element* of the offense," *id.* (emphasis added), and the superseding indictment does that by tracking the language of the statute.

Count twelve alleges a flagrant violation of FECA's core prohibition against coordination. The superseding indictment charges the offense in the language of the statute and sets forth facts exposing the defendant's scheme to willfully circumvent FECA's contribution limits by secretly using Posey and Center for the American Future as an arm of his Senate campaign.   Because count twelve properly alleges an offense and the defendant has received ample notice of the charge, his motion to dismiss should be denied.

49

C.   The statute prohibiting excessive campaign contributions through coordination is neither void for vagueness nor unconstitutional under the First Amendment.

In addition to arguing that the superseding indictment fails to properly allege an offense, the defendant contends that the charge in count twelve is unconstitutionally vague and offensive to the First Amendment.   Both arguments are foreclosed by Supreme Court precedent.

In *McConnell*, the Court addressed a vagueness challenge to the same coordination language alleged in count twelve of the superseding indictment: "in cooperation, consultation, or concert with, or at the request or suggestion of" a candidate.   *McConnell*, 540 U.S. at 219.   The *McConnell* challengers argued that this language was "unconstitutionally vague because [it] permit[ted] a finding of coordination even in the absence of an agreement."   *Id.* at 220.   They stressed "the importance of a clear definition of 'coordination,'" particularly because "political supporters [could] be subjected to criminal liability if they exceed[ed] the contribution limits with expenditures that ultimately [were] deemed coordinated."   *Id.*[11]

Observing that "the relevant statutory language [for coordination] ha[d] survived without constitutional challenge for almost three decades," the Court quickly disposed of the challengers' vagueness argument.   *Id.* at 222.   Based on a plain reading of the statute, the Court concluded that "FECA's longstanding definition of coordination 'delineates its reach in words of common understanding,'" *id.* (quoting *Cameron v. Johnson*, 390 U.S. 611, 616 (1968)), and gives "'fair

---

[11] The specific challenge in *McConnell* focused on a newly enacted provision of the Bipartisan Campaign Reform Act (BCRA) that prohibited "coordination" between party committees and individuals or groups making outside expenditures.   *McConnell*, 540 U.S. at 219.   The Court noted, however, that the vagueness challenge applied equally to FECA's longstanding prohibition on coordination with candidates, the same statute at issue here.   *Id.* at 220 (recognizing that the *McConnell* challengers' argument "reaches beyond BCRA, calling into question FECA's preexisting provisions governing expenditures coordinated with candidates").

notice to those to whom it is directed,'" *id.* at 223 (quoting *Am. Commc'ns Assn. v. Douds*, 339 U.S. 382, 412 (1950)).   As such, the statute prohibiting excessive campaign contributions through coordination is "not unconstitutionally vague."   *Id.*

The defendant's First Amendment challenge to count twelve is equally flawed.   The premise of this argument—that the government can regulate coordinated expenditures only if the communication involves "express advocacy" (Mot. to Dismiss Count 12, at 12, 14; Mot. to Dismiss Counts 1-8, at 11)—is wrong.   There simply is no requirement that coordinated expenditures must involve "express advocacy" in order to be regulated as excessive campaign contributions.

FECA treats coordinated expenditures as contributions, not expenditures.   *Colorado II*, 533 U.S. at 438 ("Expenditures coordinated with a candidate . . . are contributions under the Act."). Restrictions on coordinated expenditures, like restrictions on any run-of-the-mill campaign contributions, are therefore subject to "relatively complaisant" First Amendment review.   *FEC v. Beaumont*, 539 U.S. 146, 161 (2003); *Colorado II*, 533 U.S. at 446 (observing that "*Buckley* subjected limits on coordinated expenditures by individuals and nonparty groups to the same scrutiny it applied to limits on their cash contributions").   And under the more relaxed First Amendment standard, the Supreme Court has routinely upheld limits on contributions to federal candidates and their campaigns—without imposing any additional requirement that the contributions involve "express advocacy."   *See Colorado II*, 533 U.S. at 441-42 (collecting cases); *see also FEC v. Christian Coalition*, 52 F. Supp. 2d 45, 87 (D.D.C. 1999) (citing *Orloski v. FEC*, 795 F.2d 156, 167 (D.C. Cir. 1986) (finding the argument that "the 'express advocacy' limitation must apply to expressive coordinated expenditures" to be "untenable")).

51

Indeed, the defendant's argument—that coordinated expenditures can be regulated as excessive campaign contributions only when the coordinated expenditures involve "express advocacy"—was rejected by the Supreme Court in *McConnell*, where the Court made clear that Congress can regulate coordinated expenditures that do not constitute "express advocacy." *McConnell*, 540 U.S. at 202-03 (rejecting the notion that "coordinated expenditures for communications that avoid express advocacy cannot be counted as contributions," and explaining that "there is no reason why Congress may not treat coordinated disbursements for electioneering communications[12] in the same way it treats all other coordinated expenditures").   Given the Supreme Court's rejection of the defendant's position, his reliance on the "express advocacy" line of cases is misplaced.[13]

Count twelve properly charges the elements of making an excessive campaign contribution by coordination in the language of the statute, and the statute is neither void for vagueness nor offensive to the First Amendment.   The defendant's motion to dismiss count twelve should be denied.

---

[12] "Electioneering communications" are a specific type of expenditure that involve communications "not . . . limited" to "express advocacy."   *McConnell*, 540 U.S. at 189.

[13] Notably, the defendant's contention that he is entitled to First Amendment protections based on Center for the American Future's expenditure on the "newspaper" puts him in the precarious position of admitting his role as one of the "speakers" behind the project, while also maintaining that he did not coordinate the expenditure with Center for the American Future.   In any event, because the coordinated expenditure alleged in count twelve is considered a "contribution," and the Supreme Court has routinely upheld congressional limits on such contributions to candidates, the First Amendment provides no solace to the defendant.

V.   **RESPONSE TO MOTION TO DISMISS COUNTS FOURTEEN THROUGH TWENTY-TWO, TWENTY-FOUR, AND TWENTY-SEVEN (R. Doc. 95)**

The defendant's motion to dismiss counts fourteen through twenty-two, twenty-four, and twenty-seven contends that the allegations in those paragraphs of the indictment "as applied" to this case are unconstitutional.   (Motion to Dismiss Counts 14-22, 24, and 27 (Money Laundering) Based on an "As Applied" Challenge to the Statutes and for Otherwise Unconstitutionally Failing to Safeguard Protected Speech from Criminal Liability, R. Doc. 95 at 1) (hereinafter "Mot. to Dismiss Money Laundering Counts").   Specifically, he theorizes that the language of the indictment, which is taken directly from the relevant statutes, improperly provides for his conviction under 18 U.S.C. §§ 1956(a)(1) and 1957(a) if the jury finds there was fraudulent activity in soliciting the funds, but concludes the financial transactions themselves "bore a rational nexus to furthering the donor's intended charitable goals."

The motion offers no facts in support of, or to clarify, his "as applied" theory. His hypothetical ignores the requirement, under both §§ 1956(a)(1) and 1957(a), that the funds which comprise the financial or monetary transaction must be proceeds of or derived from the specified unlawful activity.   *See* 18 U.S.C. §§ 1956(c)(7) & (9), 1957(f)(2) & (3).   Moreover,  it  ignores the long-standing precedent that "speech or writing used as an integral part of conduct in violation of a valid criminal statute," *Giboney v. Empire Storage & Ice Co*., 336 U.S. 490, 498 (1949), is one of the "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem," *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-572 (1942).

The defendant's motion is grounded in his suggestion that the indictment impinges on protected speech under the First Amendment and should therefore be dismissed.   The motion does

not specifically identify the protected speech at issue or how it is impinged, other than his general suggestion that the expenditure of the proceeds is protected free speech. If the only speech at issue is his financial transaction with the proceeds of a fraud, the First Amendment offers him no protection.

      A.    <u>The money laundering statutes are not unconstitutionally vague.</u>

Neither 18 U.S.C. §§ 1956(a)(1)(B)(i) or 1957(a) are unconstitutionally vague on their face. Both statutes give "the person of ordinary intelligence a reasonable opportunity to know what is prohibited," and the statutes are not so vague as to "impermissibly delegate basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) (holding vague laws offend several important values including fair notice to the public of what is prohibited and the prevention of discriminatory and arbitrary enforcement); s*ee United States v. Awan*, 966 F.2d 1415, 1424-25 (11th Cir. 1992) (Money Laundering Control Act is not impermissibly vague); *United States v. Gabriele*, 63 F.3d 61, 65 (1st Cir. 1995) (Section 1957 is not unconstitutionally vague).

The elements of 18 U.S.C. § 1956(a)(1)(B)(i) are (1) the defendant conducted a financial transaction, (2) which he knew involved proceeds from a specified unlawful activity, (3) with the knowledge that the transaction's design was to conceal or disguise the nature or source of the illegal proceeds. *United States v. Valdez*, 726 F.3d 684, 689 (5th Cir. 2013).

The elements of 18 U.S.C. § 1957(a) are "(1) property valued at more than $10,000 that was derived from a specified unlawful activity, (2) the defendant's engagement in a financial transaction with the property, and (3) the defendant's knowledge that the property was derived from unlawful activity." *United States v. Fuchs*, 467 F.3d 889, 907 (5th Cir. 2006), *cert. denied,*

549 U.S. 1272 (2007); *United States v. Brown*, 186 F.3d 661, 670-71 (5th Cir. 1999) (unlike §

1956 which requires a specific intent to promote or intent to conceal, § 1957 is a money spending

statute).   Spending proceeds of the fraud, through a monetary transaction in excess of $10,000,

violates § 1957(a).   *United States v. Wyly*, 193 F.3d 289, 296 (5th Cir. 1999).   The $10,000

requirement of § 1957(a) means the transaction at issue must have involved more than $10,000 in

specified unlawful activity proceeds.

The defendant argues that both the statutes and the indictment lack "limiting language."

His argument fails to specify the missing language which would cure, in his opinion, his

hypothetical scenario in which §§ 1956(a)(1) and 1957(a) "mandates" a conviction if the

fraudulently obtained proceeds "were applied in furtherance of the donors intentions and wishes."

As discussed more specifically below, the United States contends the money and financial

transactions alleged in counts fourteen through twenty-seven were not applied as the defendant

represented to the donors. The defendant's "as applied" argument misstates the law and

mischaracterizes the facts.

B.    The money laundering statutes are not unconstitutionally vague as applied to the
defendant's conduct.

1.    Counts fourteen and fifteen describe monetary transactions in excess of

$10,000 engaged in by the defendant with a portion of the $100,000 fraudulently obtained by wire

transfer from Foundation A and Person A on or about July 2, 2012.   The proceeds were deposited

into the defendant's Life Without Limits bank account.   Foundation A donated the funds to be

used for legitimate charitable or educational purposes.   (First Superseding Indictment, at ¶¶ 12,

14, 19, 28-30).   On July 3, 2012, the day following the deposit, the defendant transferred $15,000

to his campaign bank account (count fourteen).   On July 24, 2012, he transferred $27,000 of the

$100,000 to his campaign account (count fifteen).

Although not separately alleged as money laundering counts, the evidence will establish that the defendant moved approximately $83,000 of the $100,000 into his campaign account between July 3, 2012 and July 24, 2012.  (*Id.* ¶¶ 20, 27-31).  The defendant transferred the majority of remaining funds from the $100,000 donated by Foundation A on various days between July 2, 2012 and July 24, 2012 to his Presidential Trust bank account to pay debit and credit card expenses primarily.  (*Id.* ¶ 8).

2.    Counts sixteen through twenty-one concern monetary transactions in excess of $10,000 engaged in by the defendant with a portion of the $350,000 fraudulently obtained from Foundation B and Person B on or about January 30, 2013.  (*Id.* ¶¶ 15, 32-34, 39).

a.    On February 12, 2013, two checks drawn on the defendant's Life Without Limits bank account, each made payable in the amount of $13,000, were deposited into two separate bank accounts at Community Bank of Texas (counts sixteen and seventeen).  The bank accounts were held in the names of two individuals (brothers), each of whom had previously loaned the defendant $19,000. The $38,000 provided by the brothers was deposited into the defendant's Life Without Limits bank account on August 2, 2012, just a few days after the defendant had depleted the $100,000 donation from Foundation A described above.  The day following the deposit of the brothers' loan proceeds into his Life Without Limits bank account, the defendant transferred the entirety of the loan funds to his campaign account.  (*Id.* ¶ 20).

b.    On February 19, 2013, the defendant transferred $65,000 of the

56

$350,000 donation from his Life Without Limits checking account into his Life Without Limits savings account (count eighteen).   Ultimately he moved the $65,000 from the savings account back into his Life Without Limits checking account in January 2014.   The defendant then wrote a check for the remaining funds in the checking account from the $350,000, which Posey used to open two new bank accounts also in the name of Life Without Limits (counts twenty and twenty-one).   Posey had signature authority over the two new accounts.   (*Id.* ¶ 12).   A portion of the funds moved into the new Life Without Limits accounts were used to pay for expenses associated with the printing of the newspapers coordinated by the defendant during his campaign for the U.S. Senate in 2014.   (*Id.* ¶¶ 20, 22, 40-41, 44).

c.   In October 2013, the defendant withdrew $11,000 from his Life Without Limits account and purchased a cashier's check payable to Bay Area Recovery Center.   The cashier's check was deposited into the Bay Area Recovery Center's bank account on October 16, 2013 (count nineteen).   Evidence will show that the payment was for the treatment of a particular individual, a close personal friend of the defendant.   (*Id.* ¶ 34).

3.   Counts twenty-two, twenty-four, and twenty-seven involve monetary or financial transactions engaged in by the defendant and Posey with a portion of the $450,571.65 of the fraudulently obtained proceeds from Person B.   Person B agreed to donate the $450,571.65 as an independent expenditure to pay the postage on a mass mailing in support of the defendant's campaign for the U.S. Senate.   (*Id.* ¶¶ 41, 45-47).   Prior to the primary election and before the

entirety of Person B's donation had been spent on postage, the defendant and Posey instructed the direct-mail company to stop further mailings and to refund the unspent postage to Center for the American Future.   (*Id.* ¶ 48).

      a.      On March 14, 2014, a check drawn on Amegy Bank in the amount of $214,718.51 was deposited into an account controlled by Posey and held in the name of Center for the American Future (count twenty-two).   (*Id.* ¶ 13).   This check represented the funds refunded by the direct-mail company to Center for the American Future as instructed.   (*Id.* ¶¶ 48-49).

      b.      Two withdrawals were made from the Center for the American Future account on March 24, 2014, from Person B's postage funds deposited on March 14, 2014.

      1.      The first withdrawal was a transfer of $134,355.29 from the Center for the American Future bank account to Posey's personal bank account xxx0954 (count twenty-three).   Posey immediately withdrew $116,365.29 from account xxx0954, and used those funds to purchase a cashier's check payable to Life Without Limits, Inc. (count twenty-five). The cashier's check was deposited into one of the Life Without Limits bank accounts (count twenty-six) which was opened in January 2014 with half of the funds remaining from the $350,000 fraudulently obtained from Foundation B and Person B in January 2013.

      2.      A second withdrawal of $17,010 was made from the Center for the American Future account on March 24, 2014.   The withdrawn funds

were used to purchase a $17,000 cashier's check (count twenty-four). The cashier's check was made payable to an individual, J.N., and was deposited into the defendant's campaign account held in the name Steve Stockman for Senate (count twenty-seven).

The defendant may be convicted in count twenty-seven, charging a violation of § 1956(a)(1)(B)(i), only if the jury finds beyond a reasonable doubt that he conducted or attempted to conduct (or aided and abetted) the financial transaction of depositing a $17,000 cashier's check into his campaign account.   Further, they must find that the transaction involved proceeds from mail fraud, and that he knew the transaction involved proceeds of a specified unlawful activity. Finally, the jury must find that the defendant knew the transaction was designed in whole or in part to conceal or disguise the nature, source, ownership or control of the proceeds.     The deposit of the cashier's check into the campaign account is not protected free speech.   The defendant was simply accomplishing by fraud what he was prohibited from doing under FECA.

For the defendant to be convicted of the monetary transactions alleged in Counts fourteen through twenty-two, and twenty four, the jury must find beyond a reasonable doubt the he engaged in or attempted to engage in (or aided and abetted) a monetary transaction involving over $10,000 in criminally derived proceeds from mail or wire fraud.   Further, they must find that the defendant knew the transaction involved criminally derived property.   The monetary transactions summarized in the chart below do not impinge on the defendant's rights under the First Amendment.

| COUNT | § 1957(a) MONETARY TRANSACTIONS |
|---|---|
| 14 | Transfer of proceeds to Stockman campaign account |
| 15 | Transfer of proceeds to Stockman campaign account |
| 16 | Repaid a loan which had earlier been funneled into Stockman campaign |
| 17 | Repaid a loan which had earlier been funneled into Stockman campaign |
| 18 | Transfer of proceeds to another LWL account later used, in part, for Stockman campaign |
| 19 | Purchase of cashier's check to pay for friend's rehabilitation treatment |
| 20 | Opening deposit of new Life Without Limits bank account |
| 21 | Opening deposit of new Life Without Limits bank account |
| 22 | Deposit of the refund of unused postage funds |
| 24 | Purchase of cashier's check payable to an individual but deposited into Stockman campaign account |

The premise of the defendant's theory for dismissal is the Ross Center and Life Without Limits are legitimate charities since each had been given Section 501(c)(3) status by the IRS and, therefore, his expenditure of the donated funds is protected as free speech under the First Amendment.   Based on that construction of the facts, he argues the money laundering counts cannot survive First Amendment scrutiny.

The defendant cites *Serafine v. Branaman*, 810 F.3d 354 (5th Cir. 2016), as authority for the proposition the money laundering statutes are overbroad as applied in this case.   The facts in *Serafine* are distinguishable from this fraud and money laundering prosecution.   The state regulation at issue in *Serafine* was a "content-based restriction on speech-proscribing one's ability to claim to be a psychologist."   *Id*. at 361.   The Fifth Circuit found the regulation violated the First Amendment since it was used to infringe on political speech rather than professional or commercial speech.   The governmental interest in protecting a psychotherapist's clients in the context of occupational-related speech was not present in speech outside of the actual practice of the profession.   The statute "must be 'narrowly tailored to serve an overriding state interest.'"   *Id.*

(quoting *United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 812-13 (2000) (holding content-based restrictions must survive strict scrutiny)).   The money laundering counts the defendant seeks to dismiss, are not based on statutes which place "content-based restrictions" on speech.

The defendant's claim that the money laundering statutes are unconstitutional as applied in his case, glosses over the salient facts that the funds involved in the financial and monetary transactions were proceeds of fraud, and that the alleged charities he solicited for were no more than a vehicle for his fraud and a pass through for the donated funds.   Importantly, "the First Amendment does not shield fraud." *Illinois ex rel. Madigan v. Telemarketing Associates, Inc.,* 538 U.S. 600, 612 (2003) (citing *Donaldson v. Read Magazine, Inc.,* 333 U.S. 178, 190, 68 S.Ct. 591, 92 (1948)).   Indeed, it is axiomatic that, "[l]ike other forms of public deception, fraudulent charitable solicitation is unprotected speech." *Id.*

As noted previously in connection with the defendant's motion to dismiss counts one through eight, the Supreme Court in a series of cases analyzed various laws to determine whether free speech was impermissibly infringed on by the proscriptions in the law. *See Vill. of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620 (1980); *Sec'y of State of Md. v. Joseph H. Munson Co.,* 467 U.S. 947 (1984); *Riley v. Nat'l Federation of the Blind of N.C., Inc.,* 487 U.S. 781 (1988).   In each case, the Court found the statute or regulation as applied, incompatible with the First Amendment.   While instructive, these cases are distinguishable from this case since they each concerned "prophylactic laws designed to combat fraud by imposing prior restraints on solicitations when fundraising fees exceeded a specified reasonable level." *Madigan*, 538 U.S. at 612.   Importantly, in those cases the Supreme Court "took care to leave a

61

corridor open for fraud actions to guard the public against false or misleading charitable solicitations." *Id.* at 617.

The defendant's attempt to apply the specific holdings in *Schaumburg, Munson*, and *Riley* to this case is inconsistent with the law and the facts.   The defendant's motion in essence proposes that all expenditures made in the name of a "charity" are protected speech.   By extension, he argues that the monetary and financial transactions at issue in this case are expenditures of a charity and therefore protected speech.   *Schaumburg, Munson*, and *Riley* do not stand for the proposition that the defendant could obtain donations by fraud and then take as much of the donation money as he wanted without answering to criminal charges.   "It is one thing to compel every fundraiser to disclose its fee arrangements at the start of a telephone conversation, quite another to take fee arrangements into account in assessing whether particular affirmative representations designedly deceive the public."   *Madigan,* 538 U.S.at 622-23.

The money laundering statutes are not overbroad as applied in this case.   They do not contain content-based restrictions on free speech, and they do not impose prior restraints on either charitable solicitations or the manner in which donations are spent.   The application of the money laundering statutes to the facts of this case do not operate as governmental value judgments regarding the appropriateness of charitable expenditures.

The specific language of §§ 1956(a)(1)(B)(i) and 1957(a), along with the detailed explanations contained in the definitions of the terms of the statutes, give fair warning of prohibited conduct to ordinary persons and protect criminal defendants from arbitrary application of the statutes by juries.   *United States v. Gilliam*, 975 F.2d 1050 (4th Cir. 1992) (finding the numerous and detailed definitions of the terms used in the money laundering statute sufficiently curtailed the

discretion of law enforcement); *United States v. Gleave,* 786 F.Supp. 258, 267-68 (W.D.N.Y. 1992) (Section 1956 did not suppress First Amendment right to freedom of association and therefore is not unconstitutionally overbroad), *rev'd on other grounds by United States v. Knoll,* 16 F.3d 1313 (2d Cir. 1994).   The money laundering statutes are narrowly tailored to serve an overriding governmental interest in addressing criminal conduct and the movement of criminal proceeds into commerce.

Whether or not the funds involved in the monetary and financial transactions were proceeds of fraud is a question of fact for the jury, as is a defendant's required mental state.   The illogical conclusion of the defendant's position would effectively immunize from prosecution those who fraudulently pretend their solicitations for donations are on behalf of a legitimate charity and then claim the protections of the First Amendment with regard to how the funds were solicited, moved, and spent.

## VI.   RESPONSE TO MOTION TO STRIKE SURPLUSAGE (R. Doc. 96)

The defendant moves to strike several paragraphs and phrases from the superseding indictment as surplusage.   (Defendant Stockman's Motion to Strike Prejudicial Surplusage From the Indictment, R. Doc. 96, at 1-2) (hereinafter "Mot. to Strike Surplusage").   Specifically, the defendant moves the Court to strike references to his role in defrauding Person A out of $285,000 through purported charitable donations to the Ross Center in 2010.   The Court should deny this request.   Because the defendant's fraudulent conduct in 2010 is essential to proving the existence of an overarching fraud scheme and the defendant's intent to defraud, the allegations involving the Ross Center and Person A are not surplusage.

Generally, allegations in an indictment that are unnecessary to prove the crime charged are

considered surplusage.   *See United States v. Miller*, 471 U.S. 130, 136–37 (1985); *see also United States v. Grant*, 850 F.3d 209, 215 (5th Cir. 2017) (quoting *United States v. Valencia*, 600 F.3d 389, 432 (5th Cir. 2010) (observing that "'allegation[s] of additional facts beyond those which comprise the elements of the crime [are treated as] mere surplusage'")).   The level of proof required to strike surplusage from an indictment is "exacting."   *United States v. Bullock*, 451 F.2d 884, 888 (5th Cir. 1971).

In his motion to strike, the defendant does not dispute that the superseding indictment charges a single scheme to defraud orchestrated by the defendant over a period of years from 2010 through 2014.   As set forth in the indictment, the purpose of the scheme was for the defendant to enrich himself and illegally fund his political activities by fraudulently soliciting donations from charitable foundations and the individuals who ran those foundations.   (First Superseding Indictment, at ¶17).   The superseding indictment alleges that the defendant secured these donations in the names of sham nonprofit organizations—the Ross Center, Life Without Limits, and Center for the American Future—before spending the proceeds on himself, his political campaigns, and his associates.   (*Id.* ¶¶ 11-13, 18-20, 22.)   Importantly, the misrepresentations over the course of the scheme shared the same common element: that the donations to the nonprofit organizations would be used for legitimate charitable or educational purposes consistent with the nonprofits' purported missions.   *Cf. Owens v. United States*, 221 F.2d 351, 354 (5th Cir. 1955) (observing that the "most important common element" connecting several transactions in a single scheme was "the representation that [the defendant] was a prosperous and successful business man with great financial power"); *United States v. Rodgers*, 624 F.2d 1303, 1307 (5th Cir. 1980) (noting that "the evidence clearly supported the conclusion of a single scheme with a common goal,

operations carried out in virtually identical manner, and an overlapping of participants").

That the scheme to defraud began in 2010, outside the statute of limitations period, is of no moment. What matters is that the crimes alleged in the superseding indictment—the mailings and wires in furtherance of the scheme—all occurred within the limitations period. *See United States v. Ashdown*, 509 F.2d 793, 798 (5th Cir. 1975) (noting that there was "no limitations problem" when "the crimes alleged in every count are mailings in furtherance of the scheme" and the "mailings occurred within the statutory period"); *see also United States v. Eisen*, 974 F.2d 246, 263 (2d Cir. 1992) ("[T]he statute of limitations in a mail fraud case runs from the date of the charged mailing, notwithstanding that the defendant's actions concerning the scheme to defraud occurred before the statutory period."). Given the timely filing of the mail and wire fraud counts, "'it is no defense that the scheme was formed earlier, and proof running back of the statute is admissible to show the scheme and intent if it is connected up with the scheme existing when use of the mails [and wires] occurred.'" *Ashdown*, 509 F.2d at 798 (quoting *United States v. Blosser*, 440 F.2d 697, 699 (10th Cir. 1975)); *United States v. Pharis*, 298 F.3d 228, 234 n.3 (3d Cir. 2002) (en banc) ("[M]ailings that fall outside the statute of limitations can be considered as evidence to prove later fraud that was within the statute of limitations. Moreover, a mailing that is within the statute of limitations can impose criminal liability for conduct that was part of the same scheme but that was initiated outside the statute of limitations.") (internal citation omitted); *United States v. Tadros*, 310 F.3d 999, 1007 n.5 (7th Cir. 2002) (noting "that the evidence of fraudulent activity occurring prior to April 12, 1996, though not within the relevant statute of limitations, is relevant to the government's proof that the defendant participated in a scheme to defraud and that he intended to defraud by using the mail and wires"); *see also United States v. Dula*, 989 F.2d 772,

777-78 (5th Cir. 1993) ("The defendants were charged with conducting a continuing scheme to defraud, characterized by the substitution of products, and it was necessary for the government to prove that the defendants had intentionally devised a scheme and artifice to defraud.   In developing proof of intent and motive, the prosecution may offer all of the surrounding circumstances that were relevant.").

Because the superseding indictment alleges a single scheme from 2010 to 2014 (which the defendant does not dispute) the 2010 conduct is necessarily "connected up," *Ashdown,* 509 F.2d at 798, with the mailings and wires in furtherance of the scheme.   Far from constituting "surplusage," the allegations concerning the defendant's conduct in 2010 are necessary to prove the existence of an overarching scheme to defraud and the defendant's guilty intent—essential elements of counts one through eight of the superseding indictment.

The defendant's other complaints with respect to the superseding indictment's 2010 paragraphs similarly fail.   First, the defendant asserts that the 2010 paragraphs do not allege any fraudulent misrepresentations.   Yet the indictment plainly charges the defendant with "caus[ing] *materially false representations* to be made to Person A that Foundation A's money would be used for legitimate charitable or educational purposes, including voter education in locations specified by Person A."   (First Superseding Indictment, at ¶ 24) (emphasis added).   Second, the defendant complains that this portion of the superseding indictment uses an unconstitutional "significant portion" standard as a basis for the fraud allegations.   As discussed above, however, the First Amendment offers no protections for intentionally misleading statements in furtherance of a criminal fraud scheme.   *Madigan*, 538 U.S. at 606.   Third, the defendant argues that the superseding indictment includes a "strong but false inference" that the defendant's actions caused

Person A to file a false IRS form 990-PF.   Rather than alleging an inference, the superseding indictment states a fact—that "[a]s a result of the material misrepresentations to Person A" Foundation A filed a Form 990-PF reflecting $285,000 in charitable donations to the Ross Center in 2010—and that fact must be taken as true.   *Fontenot*, 665 F.3d at 644.

Finally, the defendant complains of general prejudice from the superseding indictment's 2010 allegations because the elderly victim of the defendant's fraud in 2010, Person A, has passed away.   As discussed above, the defendant cites no authority for the proposition that a fraud perpetrator enjoys immunity from prosecution because of a fraud victim's passing.   On the contrary, the defendant bears the burden of showing actual substantial prejudice and bad faith in connection with a motion to dismiss based on pre-indictment delay, and his conclusory assertions fall far short of satisfying this standard.   *See Crouch*, 84 F.3d at 1515; *see also Ashdown*, 509 F.2d at 798 ("It would be a bizarre result indeed if a crime properly prosecuted within the limitations period could not be proven because an essential element, such as intent, could only be established by proof of incidents occurring outside the period.").

The superseding indictment's allegations with respect to the defendant's fraudulent conduct in 2010 are necessary to prove the existence of an overarching scheme and the defendant's intent to defraud.   Accordingly, references to those allegations are not "surplusage," and the defendant's motion to strike should be denied.

## VII.   RESPONSE TO REQUEST FOR PRETRIAL NOTICE OF RULE 404(B) AND RULE 609 MATERIAL (R. Doc. 97)

The United States intends to comply with Federal Rule of Criminal Procedure 404(b) and 609 in its presentation of evidence at trial.   In accordance with those rules, reasonable pretrial notice of the intent to use evidence pursuant to 404(b) and 609 will be given to the defendant.

The defendant has failed to explain why any relief is required at this point, and his request for a court order is therefore unripe and moot.

## VIII.  __CONCLUSION__

For the foregoing reasons, the United States requests that the defendant's motions to dismiss, motion to strike surplusage, and motion for pretrial notice be denied.


Dated: November 16, 2017                    Respectfully submitted,

ABE MARTINEZ                                ANNALOU TIROL
Acting United States Attorney               Acting Chief, Public Integrity Section

Melissa Annis                               Ryan J. Ellersick
Assistant United States Attorney            Robert J. Heberle
                                            Trial Attorneys

                                             /s/ *Robert J. Heberle*
                                            Robert J. Heberle
                                            Trial Attorney
                                            Public Integrity Section
                                            Criminal Division
                                            United States Department of Justice
                                            1400 New York Avenue NW
                                            Washington, DC 20530
                                            Telephone: (202) 514-1412
                                            Fax: (202) 514-3003
                                            E-mail: robert.heberle@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on November 16, 2017, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which will cause a true and accurate copy to be sent to counsel of record for all parties.

/s/ *Robert J. Heberle*
Robert J. Heberle