IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | 4:17-cr-116 (2) |
| | § | (Hon. Lee H. Rosenthal) |
| STEPHEN STOCKMAN | § | |

**STOCKMAN'S REPLY TO THE GOVERNMENT'S
CONSOLIDATED OPPOSITION TO
<u>DEFENDANT'S PRETRIAL MOTIONS</u>**

COMES NOW STEPHEN STOCKMAN, Defendant, through counsel Sean Buckley and Gary Tabakman, and files this his Reply to the Government's Consolidated Opposition to Defendant's Pretrial Motions, for cause showing the Honorable Court as follows:

## TABLE OF CONTENTS

**1. Reply to the Government's Opposition to Defendant's Motion to Dismiss Counts 1-8** …………………...…………………………..............4

    A. Defendant's Motion Did Not Challenge the Sufficiency of the Evidence, but rather the Sufficiency of the Indictment ………..……….4

    B. The Cases Relied on by the Government are Inapposite…………….…5

    C. Notwithstanding the Government's Assertions, the Rule of *Telemarketing Associates, Inc.* Governs Here…………………………..5

    D. The Rule of *Telemarketing Associates* is Grounded in the First Amendment……………………………………………………….....8

    E. The Pleading Rule of *Telemarketing Associates* Has Special Importance to Protect Members of the Legislative Branch against Vague Claimis of Misrepresentation Made by Prosecutors in the Executive Branch …………………………………………...……12

    F. The Government's Opposition to Defendant's Claims of Multiplicity Fails to Overcome Defendant's Multiplicity Challenge to Counts 3 and 4 ……………………………………………………17

**2. The Government's Opposition to Defendant's Motion to Dismiss Counts 9 - 11 Cannot Cure Its Fatal Omission From Count 9 and Relies on Inapposite Authorities in Other Respects** ………..…………....18

**3. The Government's Expansive View of Coordinated Expenditures Ignores the Statute and Misstates Numerous Court Decisions, Seeking to Avoid Controlling Fifth Circuit Precedent Requiring Dismissal of Count 12** ………………………………………………………....22

    A. The Government Gives Virtually No Attention to Defendant's Argument that the Newspaper in Question Did Not Meet the Content Standard for a Coordinated Expenditure ………………..……22

    B. The Government's Apparent Theory Appears to Be that Any "Coordinated Communication," regardless of Its Subject Matter, Constitutes a "Coordinated Expenditure" …………………….……25

C. The Government Disclaims that It Must Prove Express
   Advocacy, even though It Was Alleged in the Indictment …………..…26

D. The Government Mishandles the *McConnell* Decision which
   Governs Only Electioneering Communications …………………….27

E. The Government's Alternative Contention, that Content Can
   Be Shown Based on FEC Regulations, Is Flawed ……………….…...29

F. The Fifth Circuit's Decision in *Carmouche* Rejecting the
   Government's Argument Is Controlling, Requiring Dismissal
   of Count 12 …………………………………………………….31

**4. Stockman's Motion to Strike Surplusage Should be Granted
   because the Indictment Fails to Allege a Common Element
   of Misrepresentation** …………………………………………...31

**5. Stockman's "As Applied" Challenge to the Money Laundering
   Counts must be Analyzed as a First Amendment Issue in the
   Context of Charitable Solicitations** …………………………...34

**1.      The Government Completely Fails to Address the Arguments Set Out in Defendant's Motion to Dismiss Counts One through Eight**.

The Government rhetorically opposes Defendant Stockman's Motion to Dismiss Counts 1-8, but never rebuts the principal grounds set forth in support of that motion.

**A.      Defendant's Motion Did Not Challenge the Sufficiency of the Evidence, but rather the Sufficiency of the Indictment**.

The Government seeks to characterize Defendant's objection as one of sufficiency of the evidence.   It is not.   Defendant's motion challenged the sufficiency of the Indictment.   Specifically, Defendant's motion under Rule 12(b)(3)(b) of the Federal Rules of Criminal Procedure ("F.R.Crim.P.") pointed out "a defect of the indictment."   The Government initially stated that it understands this is Defendant's contention.   Gov't Opp. at 10.   However, the Government's opposition then largely ignores the issue of a defect in the Indictment and instead seeks to rebut a challenge that was not made in that motion — by asserting that the evidence at trial will be sufficient to support the charges.   The first two cases on which the Government relies in its opposition are *United States v. Mann*, 517 F.2d 259 (5th Cir. 1975) and *Costello v. United States*, 350 U.S. 359 (1956).   But these cases are cited as authority for the proposition that "'[a] defendant **may not properly challenge** an indictment ... on the ground that the allegations are not supported by **adequate evidence**....'"   Gov't Opp. at 10 (emphasis added).   Again, that was not and is not the challenge asserted by Defendant in his motion.

## B.       The Cases Relied on by the Government Are Inapposite.

When the Government does address the matter of the sufficiency of the allegations in the Indictment, the Government's response is no more persuasive. The Government relies on two cases that do not address the type of charges brought in the Indictment — *United States v. Kay*, 359 F.3d 738 (5th Cir. 2004) (involving bribery of foreign officials), and *United States v. Ramos*, 537 F.3d 439 (5th Cir. 2008) (involving discharge of a weapon in the commission of a crime of violence). Neither of those cases addressed the issue of allegedly fraudulent charitable fundraising, but rather set forth general rules which are applicable where the First Amendment does not impose special burdens on the government.  In essence, the Government asks this Court to ignore the specific guidance provided by the Supreme Court as to how to address the specific type of fraud asserted in this case. Instead, the Government ignores the First Amendment requirement of specificity, opting to focus on a series of general rules suitable only for run-of-the-mill fraud actions.[1]

## C.       Notwithstanding the Government's Assertions, the Rule of *Telemarketing Associates, Inc.* Governs Here.

The Government sidesteps Defendant's argument that the allegations in the Indictment are woefully insufficient in meeting the specific test set out by the U.S.

---

[1]  The Government asserts general principles, including that:  (i) the court is required to take the allegations as true; (ii) the test for an indictment is not perfection, but only meeting minimum standards; (iii) it is "'practical, not technical considerations'" which govern; and (iv) all that is required is that the indictment set out the elements of the offense to enable a defendant to plead or avoid double jeopardy.  Gov't Opp. at 11.

Supreme Court as being required by the First Amendment in *Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600 (2003). In that case, the Supreme Court allowed fraud actions against those involved in charitable fundraising, but established a firm rule requiring specificity in bringing such charges of fraud for the reason that the act of making charitable solicitations is protected by the First Amendment. *See Telemarketing Associates, Inc.* at 617-18 ("the complaint and annexed affidavits, in large part, alleged not simply what Telemarketers failed to convey; they also described what Telemarketers misleadingly represented"). That Supreme Court rule applicable to charitable solicitations limits the ability of the government to compel a defendant to be forced to defend himself against generalized charges of fraud — exactly the type of charges contained in the Indictment. It requires the Government to bring specific charges, identifying the specific misrepresentation — exactly what Defendant has shown that the Indictment did not do. *See* Defendant Motion to Dismiss Counts 1 through 8 at 4-5. Those Supreme Court-ordained special rules governing charges of fraud in making charitable solicitations are binding on this Court as it evaluates Defendant's motion based on a defect in the Indictment. Gov't Opp. at 12. These special rules fully support Defendant's request to strike Counts 1 through 8.

The Government then devotes two pages to discussing the *Village of Schaumburg* trilogy to establish the proposition that, while general prophylactic statutes intended to prevent fraud in charitable fundraising are unconstitutional, criminal charges of fraud are somehow exempt from the First Amendment standard.

Thus, the Government attempts to refute the essence of Defendant's motion to strike, stating:

> Because the indictment charges the defendant with the intentional commission of mail and wire fraud based upon <u>material misrepresentations and false pretenses</u>, it sufficiently alleges that he engaged in criminal activity <u>unprotected by the First Amendment</u>. [Gov't Opp. at 12 (emphasis added).]

Although this argument may sound persuasive, it is based on a false premise and a logical fallacy. The false premise is that the Indictment alleged "material misrepresentations and false pretenses." Defendant's counsel carefully combed through the Indictment, seeking to identify any specific material misrepresentations alleged to have been made by Defendant in Counts 1 through 8, but found none.[1]

Surely, if Defendant's motion had omitted specific allegations in the Indictment of "material misrepresentation" and "false pretense," the Government would have devoted an entire section of its brief to itemize those assertions so that the Court could see how the *Telemarketing Associates* test had been met. However, the Government's opposition contains no such list. The Government apparently believes that a conclusory allegation of fraud is all that is required by *Telemarketing Associates* because, after all, the Government believes the First Amendment does not apply here. And that is the logical fallacy in the Government's argument.

---

[1] For an itemization of all such language in Counts 1 through 8, *see* Motion to Dismiss Counts 1 through 8 at 4-5. Every single statement that could possibly constitute a "material misrepresentation" or a "false pretense" was quoted verbatim. The only three statements in the indictment which had even a scintilla of specificity were discussed, and it was shown why they in no way meet the test in *Telemarketing Associates*.

### D. The Rule of *Telemarketing Associates* Is Grounded in the First Amendment.

The Government correctly observes in a quotation from *Telemarketing Associates* that "'fraudulent charitable solicitation is unprotected speech.'"  Gov't Opp. at 12 (citation omitted).  Based on that statement, the Government incorrectly concludes that this Court should have no concern about the First Amendment.  The Government apparently believes that, once federal prosecutors concluded that Defendant's actions were fraudulent, the First Amendment no longer applies.  *See also* Gov't Opp. at 15.  Of course, whenever the Government brings fraud charges against an individual in making charitable solicitations, it is precisely then that the First Amendment must apply.  Specifically, *Telemarketing Associates* provides that the First Amendment requires the Government to set out specific allegations of fraud in the solicitation of charitable and educational funds.  *Telemarketing Associates* at 617-18.

Since the Government appears not to recognize the higher standard of pleading required by *Telemarketing Associates*, it is worth restating why the First Amendment protects charitable solicitations,[2] as paraphrased from the opinion of Justice Ginsburg for the Court, as follows:

---

[2]  At various places in its brief, the Government implies that the rule governing solicitations for charitable and educational organizations should not apply here, because these particular charitable and educational organizations exempt from federal income taxation under IRC § 501(c)(3) somehow were not really charitable and educational organizations at all.  *See, e.g.,* Gov't Opp. at 17.  If the Government intended this implication, it would be wholly inconsistent with the Government's basic theory of the case, repeatedly expressed, that solicitations were made on behalf of, and in misuse of, *bona fide* charitable organizations.  Moreover, the Government does not challenge the representation in Defendant's Motion

1.  The *Telemarketing Associates* case was the first case in which the Court addressed the application of the First Amendment to individual fraud actions in charitable solicitations. *Id.* at 612.

2.  The First Amendment protects the right to engage in charitable solicitations. Charitable appeals for funds involve a variety of speech interests — communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes — that are within the protection of the First Amendment. *Id.* at 611.

3.  Simply labeling an action as one for "fraud" will not carry the day. Fraud actions must be tailored, targeting misleading affirmative representations about how donations will be used. *Id.* at 617.

Assuming *arguendo* that some of the funds in this case were not used for "charitable [or] educational purposes" (Gov't Opp. at 20), that still would not constitute actionable fraud — as the Government alleges. For example, under the Illinois law of fraud reviewed in *Telemarketing Associates*, the complainant must show that the defendant made a false representation of a material fact knowing that the representation was false, and the representation was made with the intent to mislead the listener, and succeeded in doing so. The *mens rea* of making a material misrepresentation must be present at the time that the solicitation is made. The mere fact that funds are not later spent for the purpose solicited does not establish the requisite *mens rea* to establish fraud.

Additionally, the Government seeks to persuade this Court that the Indictment should be considered sufficient because it alleges "a scheme to deceive

---

to Dismiss Counts 1 through 8 that these were and are *bona fide* charitable organizations. *See* Defendant's Motion at 4, 10, 11.

donors through repeated misrepresentations about how their donations would be used, and therefore sufficiently states an offense under *Madigan*."  Gov't Opp. at 15.  The Government repeats its allegation that this was a "fraudulent scheme involving false representations," and "the purpose" of the scheme was alleged.  *Id*. However, as Justice Ruth Bader Ginsburg explained in *Telemarketing Associates*, "Simply labeling an action one for 'fraud,' of course, will not carry the day." *Telemarketing Associates* at 617.

Lastly, the Government makes an argument that demonstrates that it either does not understand Defendant's argument based on *Telemarketing Associates*, or that it simply hopes to win this motion, regardless.[3]  The Government argues:

> The charges in this case are even less likely to impinge on First Amendment interests than the allegations in *Madigan*, since the state in *Madigan* had only to prove fraud by clear and convincing evidence, while the United States here must prove that the defendant committed fraud beyond a reasonable doubt.  [Gov't Opp. at 15 (citation omitted).]

This argument is, at minimum, nonsensical and demonstrably wrong.  The standard set out for fraud charges based on charitable solicitations applies to protect an

---

[3]  Former Attorney General and Supreme Court Associate Justice Robert Jackson, in a speech to United States Attorneys assembled in the Main Hall at the U.S. Department of Justice, once explained the duty of a United States Attorney:  "Nothing better can come out of this meeting of law enforcement officers than a rededication to the spirit of fair play and decency that should animate the federal prosecutor.  Your positions are of such independence and importance that while you are being diligent, strict, and vigorous in law enforcement you can also afford to be just.  Although the government technically loses its case, it has really won if justice has been done."

https://www.justice.gov/sites/default/files/ag/legacy/ 2011/09/16/04-01-1940.pdf.

individual from even being required to defend himself against the government's charges.[4]  Certainly, the expense and chilling effect on free speech of being indicted for a crime with a much more severe sanction is exponentially greater than the expense and chilling effect of a civil action against a charity for its fundraising practices.

The Government relies on a Ninth Circuit case, *United States v. Lyons*, 472 F.3d 1055 (9th Cir. 2007), where that court supposedly rejected the defense now raised by Defendant.  Gov't Opp. at 15.  However, the Government brief is devoid of any review of the type of specific allegations found sufficient in the indictment against *Lyons*.  Indeed, *Lyons* may be the only federal case to involve charitable solicitations fraud that involved an analysis under *Telemarketing Associates* in the 14 years since it was decided.  In *Lyons*, the Ninth Circuit explained that "the government both <u>alleged in its indictment</u> and offered evidence at trial of <u>specific misrepresentations and omissions</u> they made regarding the use of donated funds."[5] *Lyons* at 1066 (emphasis added).  The Government tries to make use of *Lyons* to resuscitate the indictment, but the fact remains that the indictment here fails to allege sufficiently specific misrepresentations or omissions that allege a crime, and thus Counts 1 through 8 must be dismissed.

---

[4]   *Telemarketing Associates* at 615 ("litigation risk ... would 'chill speech in direct contravention of the First Amendment's dictates'") (citing *Riley v. National Federation of Blind of N.C., Inc.,* 487 U.S. 781, 794 (1988)).

[5]   *See* Def. Motion to Dismiss Counts 1 through 8 at 3 n.2.

### E. The Pleading Rule of *Telemarketing Associates* Has Special Importance to Protect Members of the Legislative Branch against Vague Claims of Misrepresentation Made by Prosecutors in the Executive Branch.

The First Amendment requirement for specificity set out in *Telemarketing Associates* has the additional salutary effect of protecting elected members of the legislative branch from being subjected to political prosecutions brought by the executive branch of government based on vague allegations.  The fact that such political prosecutions occur, and with increasing frequency, is recognized by thoughtful persons on both sides of the political divide.[6]

When U.S. Senator Robert Menendez (D-NJ) was indicted at the request of the Obama Justice Department, Harvard Law Professor Alan Dershowitz explained the danger of political prosecutions generally, and how the indictment of Senator Menendez followed the Senator's severe criticism of President Obama on his conduct of our nation's foreign policy[7]:

> Whenever a prominent political figure is indicted on charges of alleged corruption, serious questions arise.  Is the prosecution part of a growing and dangerous trend toward criminalizing policy differences?  Does it endanger the free speech rights of contributors?  Will it constrain the legislative branch from serving as a check and balance on the executive?

\*\*\*

---

[6]  See "The Criminalization of Politics," The Federalist Society (Dec. 15, 2014).

[7]  *See also* S. Ferrechio, "Menendez indictment stifles prominent Democratic critic of Obama foreign policy," Washington Examiner (Oct. 31, 2017) (noting that, once indicted, Senator Menendez was forced to resign his position as ranking member on the Senate Foreign Relations Committee, removing him from his leadership role in the congressional debate as to whether to enact Iran-centered legislation).

It is absolutely essential therefore, that prosecutors take responsibility for assuring that every prosecution of a public figure — most especially of public figures who are in disagreements with the executive branch — is based on hard, incontrovertible evidence that conclusively demonstrates that the elected official deliberately, willfully and knowingly crossed the line from constitutionally protected activity to felonious criminality.  It is not enough to base prosecutions on the old saw that "where there's smoke there's fire."

\*\*\*

Senator Menendez has challenged the Administration's policy toward Cuba, expressed concerns over a nuclear deal being brokered with Iran, questioned why an agency would condone throwing good medicine in the garbage, and asked whether a foreign government or the private sector is better at port security.  Senators should not have to fear that the Executive Branch will unleash prosecutors to go after politicians who are critical of the administration. Equally dangerous are prosecutors who seek to curry favor with the administration by prosecuting its enemies without even being told to do so.   [Alan M. Dershowitz, "Dangers to Democracy in the Prosecution of Senator Menendez," Gatestone Institute (Apr. 10, 2015).]

Professor Dershowitz then put the Menendez prosecution into the context of other, recent questionable prosecutions:

These questions are now being raised in the context of the prosecution of New Jersey Senator Robert Menendez, as they previously were in several other ill-advised prosecutions, including those of former agriculture secretary Mike Espy, former presidential candidate John Edwards, the late Senator Ted Stevens, former Congressman Tom Delay and former Texas governor Rick Perry.

The reason these questions arise is not because there is no corruption in government.   It is because the laws distinguishing between constitutionally protected political activities and illegal payments to office holders are vague and indeterminate.   These laws give prosecutors enormous discretion to determine whether to prosecute questionable transactions.   And the courts refuse to second guess prosecutorial decisions even in cases where selective prosecution based on improper considerations seems evident.  [*Id.*][8]

---

[8] Since these words were penned, the jury was unable to reach a decision in the case against Senator Menendez, and one excused juror spoke publicly, saying "What I saw in the

For these reasons, the Supreme Court's rule of specificity in pleading should apply with special force when the person being accused is a member of Congress who has been at odds with the party in power, or the establishment within his own party, when the charges were brought.  On information and belief, the investigation into Defendant as a Republican congressman from Texas, apparently was launched during the time Democrat Eric Holder was Attorney General from 2009 until April 2015.[9]  The Indictment was sought when Democrat Loretta Lynch was Attorney General, also during the administration of Democrat President Barack Obama.  General Lynch came under sustained criticism for meeting privately with Democrat former President Bill Clinton on the tarmac of an airport before making the decision not to prosecute his wife, Democrat former Secretary of State Hillary Clinton, the former Democratic candidate for President of the United States.[10]  To be sure, the Indictment in this case was not returned until Attorney General Sessions took office,

---

courtroom was he was not guilty on all counts and so was Dr. Melgen."  *See* D. Porter, "Excused Menendez juror: Would've acquitted 'on all counts,'" KSL.com/AP (Nov. 9, 2017).

[9]  If further indication of the political nature of these high ranking individuals was needed, Eric Holder has been reported to now head up a new democratic effort to challenge the Republican Party's supremacy in state legislatures and the U.S. House.  *See generally* E. Dovere, "Obama, Holder to lead post-Trump redistricting campaign," Politico (Oct. 17, 2016).

[10]  *See* E. Watkins, "Bill Clinton meeting causes headaches for Hillary," CNN Politics (June 30, 2016) (Loretta Lynch and Bill Clinton talked privately for about 30 minutes while Loretta Lynch was conducting an investigation into Secretary Clinton's use of a private email server.  President Obama defended the meeting.).

but even he was a close personal friend[11] of Senator John Cornyn, whom Defendant unsuccessfully challenged for his Senate seat in a Republican primary on March 4, 2014.  General Sessions even interviewed Senator Cornyn for the position of FBI director, which it was reported Cornyn felt obligated to consider the role because Sessions, his longtime friend and Senate colleague, appealed to his desire to restore stability to the FBI and the Justice Department, but Senator Cornyn declined.[12]

Clearly, until the day he left the House of Representatives in January 2015, Congressman Stockman did not put a high priority on making friends with the establishment of either political party.  As a congressman from Texas, Steve Stockman was a constant irritant to the Obama Administration — and especially to General Holder.  He called for the impeachment and removal of General Holder as Attorney General.[13]  He announced plans to obtain a vote of the House of Representatives to arrest former IRS official Lois Lerner, after she was found in contempt of Congress.[14]  He invited Ted Nugent as his guest to the State of the Union Address, in the process getting as much attention for the pro-gun Nugent as

---

[11]  *See* Senator John Cornyn remarks on Senate Floor (Nov. 30, 2016) supporting Senator Jeff Sessions as Attorney General.  "I've had the honor of working closely with Jeff on the Senate Judiciary Committee since I came to the Senate, and I'm proud to call him a friend. Those who have watched him day in and day out understand his stalwart commitment to the rule of law and his deep and abiding concern for our country."

[12]  *See* "Sen. John Cornyn removes himself from FBI consideration," Dallas News (May 16, 2017).

[13]  *See* S. Rondeau, "Will Eric Holder Be Impeached?" The Post & Email (Nov. 11, 2013).

[14]  *See* B. Hoffman, "Rep. Steve Stockman Plans Motion to Arrest Lois Lerner," Newsmax (July 29, 2014).

President Obama received for his new gun control proposals.[15]   Congressman Stockman threatened to draft Articles of Impeachment if President Obama attempted to restrict Second Amendment freedoms by executive order.[16]   The bills Congressman Stockman introduced also caused consignation with the establishment of both political parties, as well as the bureaucracy.  One bill, introduced tongue-in-cheek, would allow taxpayers "to offer the same flimsy, obviously made-up excuses the Obama administration uses" entitled "The Dog Ate My Tax Receipts Act."[17]

Defendant does not know how many grand juries were empaneled to investigate and bring an indictment, but, upon information and belief, asserts that there was at least one grand jury in Washington, D.C. and at least one, and possibly two or more other grand juries in Houston, Texas, that considered and rejected charges, before the Government was able to convince yet another grand jury to indict Congressman Stockman in March 2017.

For all these reasons, the special pleading rule of *Telemarketing Associates* must be applied with great care by the Court to this case in order to evaluate

---

[15]  *See* J. Kurtz, "Lawmaker invites Ted Nugent to Obama's State of the Union address," The Hill (Feb. 11, 2013).

[16]  *See* S. Rondeau, "The Post & Email Asks Stockman about Obama Birth Certificate Forgery," (Aug. 18, 2013).

[17]  *See* F. Chambers, "'Convenient computer malfunction': Congressman introduces bill so taxpayers can use 'same lame excuses' as IRS when filing returns," DailyMail.com (June 20, 2014).

Defendant's Motion to Dismiss Counts 1 through 8 of the indictment as being insufficient as a matter of law.

### F. The Government's Opposition to Defendant's Claims of Multiplicity Fails to Overcome Defendant's Multiplicity Challenge to Counts 3 and 4.

The Defense agrees with the Government's position that individual overt acts in furtherance of an overarching mail or wire fraud scheme may constitute individually prosecutable units of mail and wire fraud, and withdraws argument to the contrary. However, Counts 3 and 4 of the Indictment remain multiplicitous even under this analysis.

Counts 3 and 4 are multiplicitous because the Indictment vaguely alleges that Stockman <u>caused</u> a donor to mail a check — Count 4 — and also alleges as a separate criminal offense that Stockman committed an overt act involving the mail — Count 3 — that is not explicitly excluded from the ambiguous conduct that allegedly <u>caused</u> the mailing in Count 4.

It should be noted that the Government, in its defense of Count 8 against Stockman's original multiplicity challenge, characterizes that mailing[2] as a "lulling letter" to justify its alleged fraudulent nexus to the $350,000 check from Foundation B mailed nearly a year and a half earlier. Gov't Opp. at 30, n. 7 As a matter of

---

[2] Paragraph 38 of the Indictment describes the letter sent to Person B's accountant as stating, "[Y]our Life Without Limits achieved remarkable results this year — results I couldn't have achieved without you. With your financial assistance of $350,000 in February 2013, allowed [sic] Life Without Limits, to deliver medical supplies to third world nations and support Freedom House . . . Your continued support is crucial to our mission."

law, the mailing <u>as alleged</u> in Count 8 is too remote from and incongruous with the scheme alleged in connection with Count 1 to sustain a conviction based on this theory.[3]  Thus, Count 8 should be dismissed for that reason alone.

2.      **The Government's Opposition to Defendant's Motion to Dismiss Counts 9-11 Cannot Cure Its Fatal Omission From Count 9 and Relies on Inapposite Authorities in Other Respects.**

Count 9 alleged a conspiracy under 18 U.S.C. § 371, to make "a contribution in the name of another" (sometimes called a "conduit contribution") in violation of 52 U.S.C. § 30122, as well as to file two false amendments to reports at the Federal Election Commission.  Counts 10 and 11 allege violations of 18 U.S.C. § 1001 with respect to those two FEC filings.

The predicate to both the conspiracy and false statement charges is the alleged contribution in the name of another, but the Government did not charge any violation of 52 U.S.C § 30122.  *See* Defendant's Motion at 3 n.4 and n.5.  Although that type of tactical decision is properly entrusted to prosecutors, it certainly raises a question as to what type of weakness it reveals, or what type of tactical advantage was being sought.  One possibility is that the Government did not believe that it

---

[3] The Indictment alleges that Person B's $350,000 donation was solicited for the Freedom House project, not for sending medical supplies to third world nations.  Therefore, the letter charged in Count 8 is incongruous with executing the scheme alleged in Count 1, since the letter states that the funds were used for a purpose other than the Freedom House project. Moreover, the letter (Count 8) was sent on May 13, 2014, nearly a year and a half after the January 24, 2013 check (Count 1).  *See United States v. Maze*, 94 S.Ct. 645, 649-50 (1974)(subsequent mailings increased probability of fraud being detected, contrary to essence of a lulling letter); *Henderson v. United States,* 425 F.2d 134, 143 (5th Cir. 1970)(letter that was an isolated event and occurred 10 months after the funds were obtained was not a part of appellants' basic scheme to defraud).

could prove such a violation.  Another possibility is that the Government wanted to open the door to the introduction of evidence of a conspiracy that would not be allowed if the underlying charge had been brought.   Whatever the tactical considerations may have motivated the Government, however, the Indictment still must allege all elements of the charges actually brought, which it failed to do, as explained in the three sections below, each of which sets out the basis for Defendant's motion, the basis for the Government's Opposition, and then provides comments on the Government's arguments.

1.  Count 9 of the Indictment failed to allege that the payments made by Stockman to Posey and Dodd were for the <u>purpose</u> of making contributions to the campaign.  Defendant's Motion at 2-3.  Certainly, if the Indictment is wholly devoid of any allegation of a purpose to circumvent reporting and disclosure requirements, it has failed to allege intent, and an essential element of the alleged conspiracy has been omitted, rendering the Count fatally flawed.

The Government's Opposition attempts to salvage Count 9 despite the flaw in  Count 9 by arguing that if the Court were to dismiss "the first object of the conspiracy" (conspiracy to make a conduit contribution) as improperly alleged, that a portion of Count 9 could survive (conspiracy to file false reports).  Gov't Opp. at 34 n.8.  This is by no means clear, as the Government itself admits that the actions are tied together:

> the contribution and reporting requirements of FECA go hand in hand.
> Implicit in the criminal act of making a political contribution in the

name of another is that the source of the contribution will be misreported.  [Gov't Opp. at 38.]

Moreover, it is by no means clear that Count 9 were dismissed that the case could properly proceed to trial on Counts 10 and 11.  Without any allegation of a violation of the conduit contribution prohibition, which was never charged in the Indictment, and without any charge of conspiracy, which was improperly brought, Counts 10 and 11 may well fall as well.  If there was no illegal conduit contribution, then there could be no false reporting to conceal that which was not illegal. (Defendant wishes to reserve the right to research and make this argument as appropriate at a later time if Count 9 is dismissed by the Court.)

2.  None of the three counts allege sufficient facts that support the allegation that the funds contributed by Posey and Dodd were not the property of the named contributor — an essential allegation to sustain a charge of making "a contribution in the name of another."  Defendant's Motion at 2-3.  The Indictment failed to allege the funds had not been earned by and owned by Posey and Dodd at the time the contributions were made.  *Id*. at 3.

The Government's Opposition to this point asserts that defendant's Motion is an "attempt to litigate a factual issue through a legal motion.  Importantly, it has been repeatedly rejected."  Gov't Opp. at 36.  Certainly an omission constituting a defect in an Indictment is not a factual issue, but rather a legal issue for the Court. For its assertion that Defendant's argument had been "repeatedly rejected," it invokes two cases which involved pledges to reimburse persons making conduit

contributions after the contribution was made.  The Government cites those cases because the contribution was initially made from a person's own funds.  However the circumstances of those contributions are not relevant here.  Those cases were properly decided, as it should not matter if the funds were provided in advance by a third person, or reimbursed later.  However, as the Government well knows, this situation of reimbursement is does not apply here.  Lastly, the Ninth Circuit case represented to be a rejection of Defendant's theory involved not a challenge to an Indictment, but rather a jury instruction in a case where the evidence demonstrated that the contributed funds were given to third parties as gifts — also a very different situation which provides no authority on the issue of pleading at issue here. Contrary to the Government's assertion, the omissions from the Indictment do not present factual issues, but are legal matters for the Court in the first instance.

3.  Counts 10 and 11 alleged that the contributions from Posey and Dodd "were made using funds provided to POSEY and Dodd by STOCKMAN."  This allegation identifies Stockman as the true source of the funds, and since the Indictment was crafted by the Government, it should not be allowed to offer an alternative meaning of those words.  Through this statement, the Government has placed itself in the curious position of alleging that a person who can give unlimited funds to his own campaign chose to use a subterfuge to make those contributions.

The Government's Opposition explains at length the importance of the statute prohibiting contributions in the name of another in the statutory scheme. This is not in dispute.  However, the purpose of the law governing contributions in

the name of another is explained on the FEC website: "An individual who has already contributed up to the limit to the campaign may not give money to another person to make the contribution to the same candidate." Defendant's Motion to Dismiss Counts 9-11 at 4 n.6. The same would be true if the funds were from a prohibited source, such as a corporate contribution. However, neither situation applies here. A venerable legal maxim applies here: "Where the reason for the rule does not apply, so also should not the rule."

For the foregoing reasons, Counts 9 through 11 should be dismissed.

**3. The Government's Expansive View of Coordinated Expenditures Ignores the Statute and Misstates Numerous Court Decisions, Seeking to Avoid Controlling Fifth Circuit Precedent Requiring Dismissal of Count 12.**

**A. The Government Gives Virtually No Attention to Defendant's Argument that the Newspaper in Question Did Not Meet the Content Standard for a Coordinated Expenditure.**

The Government devotes 12 pages of its Opposition to responding to Defendant's Motion to Dismiss Count 12, involving an alleged coordinated expenditure. Gov't Opp. at 41-52. However, less than a page of that section of its Opposition addresses the argument raised by Defendant, and even that misses the point. To reiterate, the Defendant's Motion focused on the second of what the FEC considers to be the three required elements of a coordinated expenditure:

> (i) <u>payment</u> prong – the ad must be paid for by a person other than the candidate, candidate's committee, or political party; (ii) <u>content</u> prong – the ad must have certain content; and (iii) <u>conduct</u> prong – the people involved must engage in certain conduct. *See* 11

22

C.F.R. §109.21(a)…. [Defendant's Motion to Dismiss Count 12 at 2 (emphasis added).]

Defendant's Motion asserted that, even though the Government must allege all elements, at this stage "the Court need not reach either of those two prongs because the advertisement in question fails with respect to the <u>content</u> prong." *Id*. (emphasis added). Rather than join issue on the "content" prong, the Government launches into a review of why coordinated expenditures are bad, not deserving of much constitutional protection, and deserve to be illegal.

This is all quite beside the point. Defendant's argument was and is that the newspaper in question did not contain express advocacy in support of or in opposition to any candidate, and therefore the newspaper could not be considered a coordinated expenditure, regardless of whether there was any coordination. The Defendant explained the basis for that position concerning content with great care.

Even though all three prongs must be met, the Government's response is that "[t]he Court need not reach" whether the content prong is met, "because the elements for coordination come from Title 52 of the United States Code, not from the FEC's administrative regulations." Gov't Opp. at 48-49. Guidance can be found in 52 U.S.C. § 30116(a)(7)(B)(i), which states that "expenditures made by any person in cooperation … with … a candidate … shall be considered to be a

contribution to such candidate,"[4] and that exercise then leads one to seeking the definition of "expenditure"[5] in 52 U.S.C. § 30101(9).

However, the Government's assertion that "the elements for coordination" come from Title 52 leaves open the question:  what are those elements, and where can they be found?  Defendant's counsel can find no such itemization.  Apparently, the Government would prefer not to be pinned down as to what are those elements.

However, the truly remarkable conclusion drawn from the Government's brief is the Government's apparent view is the only requirement for a coordinated expenditure is that it be coordinated.  The Government believes it is under no obligation to explain what type of expenditure is involved — what the content of that communication actually is.  Clearly, the Government believes the standard is not "express advocacy," but beyond that, the Government offers no alternative test.  The Government prefers to harp on the "coordination" it believes occurred, and treat as irrelevant the object of that communication. [6]

---

[4] Another aspect of the meaning for "coordinated expenditure" can be derived from the definition of "independent expenditure" in 52 U.S.C. § 30101(17), which explains that an "independent expenditure" must contain express advocacy, and not be made in coordination with a candidate, etc.

[5] There has been a judicial gloss placed on the statutory definition of "expenditure," as discussed below.

[6] The government's limited discussion of the "content" issue asserts that the "content prong" as set out in the FEC regulations is met in "at least" three ways. These assertions are also addressed below.

## B. The Government's Apparent Theory Appears to Be that Any "Coordinated Communication," regardless of Its Subject Matter, Constitutes a "Coordinated Expenditure."

By asserting the Court need not reach the content issue, the Government disclaims any interest in the content of the communication.  Gov't Opp. at 49.  But certainly even the Government cannot believe that all expenditures of any type, or even those which discuss a candidate, are considered contributions to a candidate. FECA defines "expenditure" as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office."  52 U.S.C. § 30101(9)(A)(i). The Supreme Court considered a challenge to this definition of "expenditure" in *Buckley v. Valeo*, 424 U.S. 1 (1976) and determined that only "express advocacy," included in the purview of 52 U.S.C. § 30116(a)(7)(B)(i), would be subject to this definition.  *See Buckley* at 43.

The Government does point in passing to one district court opinion in support of its proposition that the express advocacy requirement of *Buckley* does not apply to coordinated expenditures.  *FEC v. Christian Coalition*, 52 F. Supp. 45, 87 (D.D.C. 1999).  Gov't Opp. at 51.  However, it appears that no other court has ever adopted that curious view.  Moreover, it is not certain from that opinion that the district court fully understood this complex and obscure legal question, which the Government charges Defendant Stockman with understanding fully — under penalty of fine and imprisonment.

Under the Government's apparent interpretation of "coordinated expenditures," where content is irrelevant, it seems that the only requirement is a communication — of any kind — made in cooperation, consultation, or concert with the candidate. In other words, if a Congressman worked closely with the American National Red Cross to develop and publish a flyer to distribute in Houston focused on raising funds for Hurricane Harvey relief, that "coordinated expenditure" would constitute an illegal corporate contribution and render the Congressman open to indictment.

### C. The Government Disclaims that It Must Prove Express Advocacy, even though It Was Alleged in the Indictment.

At one point, the Government appears to argue it should not be required to demonstrate what the indictment alleged. Gov't Opp. at 48. Yet the indictment alleged the newspaper "advocated for [the defendant] and against his opponent." Indictment at ¶ 40. That language is unmistakable. Even in the arcane, obscure and technical world of election law, it is clearly an allegation of "express advocacy." Now that Defendant has pointed out that, as a matter of law, the newspaper actually contained no such language, rather than pointing to such express advocacy in the newspaper, the Government's position has become — "We didn't need to prove that anyway." *See* Gov't Opp. at 51-52.

The Government cites *FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431 (2001) (*Colorado II*) to support its claim that coordinated expenditures need not involve express advocacy because "FECA treats coordinated expenditures

as contributions, not expenditures." Gov't Opp. at 51. However, all that the *Colorado II* Court did was uphold the contribution *limits* as applied to coordinated expenditures, never addressing the content element of a coordinated expenditure. *Colorado II* is entirely inapplicable to this case.

If Defendant is correct that the newspaper contains no express advocacy, the Defendant cannot be held to account for making a "coordinated expenditure." From the face of the document that forms the basis of this allegation, the newspaper does not expressly advocate for or against the election of either candidate — as a matter of law.

### D. The Government Mishandles the *McConnell* Decision which Governs Only Electioneering Communications.

The Government cites *McConnell v. FEC*, 540 U.S. 93 (2003), for the proposition that the Supreme Court has already upheld the coordination provisions of FECA against challenges of vagueness. Gov't Br. at 50. *McConnell* dealt with Bipartisan Campaign Reform Act's ("BCRA") expansion of the types of illegal coordinated expenditures to include "electioneering communications" — a specific, statutorily defined type of television, radio, broadcast, cable or satellite communication, which is not at issue in this case involving a printed newspaper. *See* Gov't Opp. at 52 n.12. If this case involved an "electioneering communication," Defendant would have been charged with violating 52 U.S.C. § 30116(a)(7)(C), which he was not. But Defendant made a very different argument from the one considered in *McConnell*. Moreover, Defendant is not making a facial challenge to

the validity of the coordination provision in § 30116(a)(7)(B)(i).  Rather, Defendant

here argues that any application of the term "expenditure" beyond that which was

upheld in *Buckley* (*i.e.*, express advocacy) would make the term unconstitutionally

vague.

Nevertheless, the Government tries to invoke *McConnell* to demonstrate that

the Supreme Court has held "that Congress can regulate coordinated expenditures

that do not constitute 'express advocacy.'"  *Id*. at 52.  That is a deceptive half truth.

It is certainly true that *McConnell* sanctioned the provision of BCRA regulating the

new category of "electioneering communications," which is a broadcast using the

names of candidates in the weeks before primary and general elections.  However,

it is likewise certainly false that the *McConnell* Court broadened the definition of

"expenditure" beyond "express advocacy," outside of the narrow confines of

"electioneering communications."    *McConnell* provides no authority for the

Government's view that the Supreme Court has rejected a challenge to applying the

prohibition on "coordinated expenditures" beyond those involving "express

advocacy," as involved here.

Moreover, *McConnell* actually supports Defendant's argument that

"coordinated expenditures" must include "express advocacy" in order to fit within

the definition of "expenditure," the *McConnell* Court stated:

> Section 202 of BCRA amends FECA § 315(a)(7)(C) to provide that
> disbursements for "electioneering communication[s]" that are
> coordinated with a candidate or party will be treated as contributions
> to, and expenditures by, that candidate or party. 2 USC §
> 441a(a)(7)(C) (Supp. II).  The amendment clarifies the scope of the

> preceding subsection, § 315(a)(7)(B), which states more generally that "expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of" a candidate or party will constitute contributions.  2 USC §§ 441a(a)(7)(B)(i)-(ii) (2000 ed. and Supp. II).  In *Buckley* we construed the statutory term "expenditure" to reach only spending for express advocacy.  BCRA § 202 pre-empts a possible claim that § 315(a)(7)(B) is similarly limited, such that coordinated expenditures for communications that avoid express advocacy cannot be counted as contributions. [*McConnell* at 202 (emphasis added) (citations omitted).]

In other words, even as the Supreme Court ruled in *McConnell* that BCRA's new "electioneering communication" provision constitutionally could apply to communications without express advocacy, no change was being made to the decision in *Buckley*, that "the statutory term 'expenditure' [reached] only spending for express advocacy."  *Id*.

**E.  The Government's Alternative Contention, that Content Can Be Shown Based on FEC Regulations, Is Flawed.**

After completely disclaiming the applicability of the FEC regulations to the element of this criminal case, the Government then asserts that the newspaper actually meets three of the aspects of the "content prong" required to find a coordinated communication.  *See* Gov't Opp. at 48-49.  However, the Indictment is devoid of any allegation that supports the Government's new, alternative claim.

- With respect to the first aspect, the Indictment does not allege that "campaign materials" were published or republished.

- With respect to the second aspect, the regulation erroneously applies the definition of an "electioneering communication" to a mass mailing, outside of the context of BCRA's electioneering communications.  This definition is not supported by Title 52, and furthermore, the Indictment contains no such allegation.

- With respect to the third aspect, the regulation is based on the "functional equivalent of express advocacy," which is essentially the alternative definition of express advocacy rejected by *Buckley* and *Chamber of Commerce v. Moore*, 288 F.3d 187 (5th Cir. 2002). The Indictment does not allege that the communication was the "functional equivalent" of express advocacy.

Defendant's Motion to Dismiss Count 12 explains that even FEC Commissioners will not authorize enforcement actions based on flawed regulations.

Defendant believes that the FEC regulations do not clearly state that what he is alleged to have done violates FECA. After all, it can be readily understood from the complex discussion as to what election law does and does not provide so that. At a minimum, the flaws with the Government's theory go to the issue of notice, that the FEC regulations provide no clear direction of the sort the Government asserts.

However, in the final analysis, Defendant agrees with the Government that it should be the statute, not regulations, that should control whether criminal charges may be brought in this case. *See* Gov't Opp. at 47-49 ("the elements for coordination come from Title 52 of the United States Code, not from the FEC's administrative regulations"). Until the Government's Opposition disclaimed any effort to hold Defendant criminally responsible for any violation of FEC regulations, counsel for Defendant had suspected that the Indictment must have been an effort to apply those FEC regulations. If the Indictment had been based exclusively on the statute, as cabined by *Buckley, Chamber of Commerce v. Moore,* and *Center for*

*Individual Freedom v. Carmouche,* 449 F.3d 655 (5th Cir. 2006), no violation of the statute could be identified.   No further argument is now possible because the Government has not identified the statutory elements of the crime alleged.

### F. The Fifth Circuit's Decision in *Carmouche* Rejecting the Government's Argument Is Controlling, Requiring Dismissal of Count 12.

In any event, all efforts by the Government to support Count 12 are unavailing, due to the existence of controlling law in this Circuit which rejects its legal argument.   As Defendant's Motion to Dismiss Count 12 explained, in *Carmouche*, the Fifth Circuit clearly understood that *McConnell* made no change to *Buckley*'s limiting definition on "expenditures" outside the context of "electioneering communications."   That decision left standing the requirement that "coordinated communications" only apply to those communications which contain "express advocacy."   *See* Defendant's Motion to Dismiss Count 12 at 9.   As the Government failed to discuss or even cite *Carmouche* in its opposition, and made no effort to demonstrate that the newspaper in question constituted express advocacy, the Motion to Dismiss Count 12 should be granted.

### 4. Stockman's Motion to Strike Surplusage Should be Granted because the Indictment Fails to Allege a Common Element of Misrepresentation.

The Government begins its argument in opposition to Stockman's Motion to Strike Surplusage by claiming: "In his motion to strike, the defendant does not dispute that the superseding indictment charges a single scheme to defraud orchestrated by the defendant over a period of years from 2010 through 2014."

Gov't Opp. at 64  This is inaccurate.  To the contrary, Stockman states in his Motion to Strike Surplusage:

> "These paragraphs purport to frame the Counts charged in the indictment as being part of an overarching scheme that began long before, by accusing Stockman of defrauding a donor ("Person A") through a charitable entity called "The Ross Center" in 2010.  [Defendant's Motion to Strike Surplusage at 2 (emphasis added)].

Defendant's intended meaning of the word "purport" in that sentence was as a transitive verb meaning "to have the often specious appearance of being."[7] "Specious," in turn, is defined as "superficially plausible, but actually wrong."[8] Upon examination, Defense counsel recognizes that the intended meaning of "purport" may have been fairly lost in translation.  Nevertheless, the additional context provided within the cited sentence, *supra*, should have put the Government on notice that Stockman was *complaining about* the scope of the scheme(s) alleged in the Indictment, not acquiescing to it.

To be clear, Stockman is objecting to the Government's specious inclusion of an earlier and unrelated set of events in the Indictment for the calculated purpose of creating the illusion of a broad and overarching scheme taking place over an extended period of time.

The Government's primary argument against striking the Ross Center surplusage from the Indictment seems to be that the misrepresentations over the

---

[7] https://www.merriam-webster.com/dictionary/purport  (transitive verb)
[8] https://www.merriam-webster.com/dictionary/specious

course of the scheme shared a common element, which was that the donations to the nonprofit organizations would be used for legitimate charitable or educational purposes consistent with the nonprofits' purported missions. *See* Gov't Opp. at 64.

The Indictment, however, is wholly devoid of any explicit allegations that Stockman intended at the time of any solicitation to misapply resulting donations. Such is the essence of a "misrepresentation." The face of the Indictment itself contradicts the idea of a "common element" of misrepresentation by alleging a litany of subsequent expenditures following no apparent predictable or discernable pattern or timetable. The inherently random and unforeseeable nature of these expenditures wholly negates the idea that planned or fixed expenditures formed the basis for any misrepresentation at the time of any solicitation. As stated in the context of Counts 1-8, *supra*, the mere fact that funds are not later spent for the purpose solicited does not establish the requisite *mens rea* to establish fraud.

Because the Government has failed to illustrate a sufficient "common element" justifying inclusion of The Ross Center allegations in the Indictment, those allegations should be struck for the reasons stated in Stockman's Motion to Strike Surplusage.

5.   **Stockman's "As Applied" Challenge to the Money Laundering Counts must be Analyzed as a First Amendment Issue in the Context of Charitable Solicitations.**

The Government's Opposition to Stockman's Motion to Dismiss Counts 14-22, 24, and 27 suffers the same indifference to the First Amendment as its Opposition to Stockman's Motion to Dismiss Counts 1-8.

Just as "[s]imply labeling an action for 'fraud,' of course, will not carry the day" in pleadings targeting charitable solicitations, *Telemarketing Associates* at 617, it certainly cannot be the case that otherwise protected First Amendment speech in the context of charitable solicitations cannot survive some taint in the solicitation.

Defendant acknowledges the long-standing precedent cited by the Government for the proposition that "speech or writing used as an integral part of conduct in violation of a criminal statute" *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949), is one of the "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Caplinsky v. New Hampshire,* 315 U.S. 568, 571-72 (1942).  However, the basis of Stockman's complaint here is not that he could be punished for engaging in speech inherent to a criminal purpose, but rather, that he could be punished for First Amendment activity that would otherwise be protected by the First Amendment but for its incidental relationship to the taint of fraud.  As discussed in Section 1, *supra*, the matrix of charitable solicitations and

politics underlying this issue demands unique and heightened First Amendment scrutiny beyond the typical analysis in a run-of-the mill bank fraud case, for example.

For the reasons stated in Stockman's Motion to Dismiss Counts 14-22, 24, and 27, those Counts should be dismissed.

Respectfully submitted,


/s/ Sean Buckley
Sean Buckley
770 S. Post Oak Ln., Ste. 620
Houston, Texas  77056
TEL:  713-380-1220
FAX:  713-552-0746
buckleyfirm@gmail.com
State Bar No. 24006675

/s/ Gary Tabakman
Gary Tabakman
JP Morgan Chase Building
712 Main Street, Suite 2400
Houston, Texas 77002
TEL:  713-228-8500
FAX: 713-228-0034
gary@bdslawfirm.com
State Bar No. 24076065


## CERTIFICATE OF SERVICE

I certify that on this the 27th day of November, 2017 I provided a copy of this Reply to the Government and all parties via the ECF system.


/s/ Sean Buckley
Sean Buckley