United States Courts
Southern District of Texas
FILED
OCT 05 2021
Nathan Ochsner, Clerk of Court

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | X | |
| | X | |
| Plaintiff-Respondent, | X | Case No. 4:17-CR-116-2 |
| | X | |
| vs. | X | |
| | X | |
| STEPHEN E. STOCKMAN, | X | |
| | X | |
| Defendant-Petitioner. | X | |
| | X | |

**DEFENDANT STOCKMAN'S 28 USC §2255 MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY**

Stephen E. Stockman, (Petitioner or Defendant) files this motion, **PRO SE**, under 28 U.S.C. §2255, challenging his conviction and sentence in this case. In support thereof, Petitioner shows the following:

**Jurisdiction and Custody**

The Court has jurisdiction in this case under 28 U.S.C. §2255. Petitioner is currently in the custody of Respondent on supervisory release at 2402 Whitman Way, Friendswood, Texas 77546, in violation of the Constitution and laws of the United States under 28 U.S.C. §2255(a), and challenges said conviction and sentence on grounds that respondent's custody over him is unconstitutional and unlawful.

**Background and Procedural History**

Petitioner is and currently on supervisory release after having been convicted of a crime sentenced in 4:17-CR-116-2, United States District Court, Southern District, Houston. His

date of sentencing was November 19, 2018. His conviction by a jury was April 12, 2018. An appeal was taken and the matter was affirmed by the Fifth Circuit. The Fifth Circuit decision was appealed to the Supreme Court. Supreme court's decision was to refuse the appeal on October 5, 2020. On December 22, 2020, President Donald J. Trump commuted Petitioner's sentence to time served. 28 U.S.C. § 2255(f) provides for a one-year limitations period for § 2255 motions. This matter is timely filed as it one year from the decision by the Supreme Court.

Defendant-Petitioner brings this matter pursuant to 28 U.S.C. § 2255 which provides that a federal prisoner may seek release upon the ground that the sentence was imposed in violation of the Constitution, or laws of the United States. The § 2255 claim herein is for ineffective assistance of counsel in violation of the Sixth Amendment, prosecutorial misconduct, and for violations of other constitutional rights. The very nature of concerns voiced by the 5th Circuit support Defendant's position that his trial counsel was ineffective such that he did not obtain a fair trial and his appeal was irreversibly tainted by the failure to raise the issues properly and timely at the pretrial and trial stages.

**Decision Being Challenged**

Defendant is challenging the validity of his conviction and sentence based on violation of constitutional rights including 1. Numerous Sixth Amendment violations including violations of the Confrontation Clause, 2. False and misleading evidence

presented by the government and its misconduct, 3. Violations of Equal Protection, 4. Fifth Amendment violations, 5. Fourteenth Amendment violations, and 6. First Amendment violations, and 6. Double Jeopardy.

**Procedural Background**

Defendant was convicted after a jury trial. He was taken into custody and sentenced on November 7, 2018, signed and entered November 14, 2018. The appeal to the Supreme Court was decided on October 5, 2020, leaving the 5th Circuit decision in place.

**Relevant Factual Background**

Defendant Stephen E. Stockman served as a member of the U.S. House of Representatives first from 1995 to 1997 and again from 2013 to 2015. Record Item ("RI") [ROA.1927]. After he left Congress for the first time, Stockman was affiliated with The Leadership Institute, a nonprofit organization that offers training in a variety of political and public policy-related skills where he met Thomas Dodd ("Dodd") and Jason Posey ("Posey"). Both men would later work for Stockman's political campaigns, as staffers in his Congressional office, and also with Stockman on independent ventures.

Stockman and Dodd worked together on behalf of multiple ideologically-oriented nonprofit organizations, including The Leadership Institute, wherein Dodd would enlist Stockman in soliciting money from, and performing work for, Dodd's target donors and clients. RI [ROA.3547-48, 3552]. In 2010, Stockman and Dodd solicited Stanford Rothschild Jr. ("Rothschild"), a wealthy philanthropist who frequently donated to

conservative political causes. RI [ROA.3549, 3935-37]. Dodd had previously solicited Rothschild on behalf of The Vanguard Organization, another nonprofit foundation for which Dodd raised money. RI [ROA.3578-79]. In 2010, these solicitations included Stockman and Dodd seeking Rothschild's monetary support for the production and distribution of a book designed to convince Jewish voters to support conservative political causes. RI [ROA.3556-57]. Rothschild also provided Dodd and Stockman with lists of candidates for political office whose candidacies he wanted to facilitate or impede. RI [ROA.3559-60.]

Rothschild's contributions were made as donations from his private foundation to the Ross Center, which at the time was a non-profit 501(c)(3) organization. RI [ROA.4004]. The Ross Center was originally organized by Posey to conduct certain charitable projects, including providing orthodontic care for children and funding drug-treatment services. RI [ROA.4004-05]. Posey later gave Stockman permission to take over the operations of the Ross Center. The Ross Center lost its 501(c)(3) status for failure to file Form 990 informational tax returns with the IRS. RI [ROA.4006].

Rothschild, to pursue his objectives, contributed a total of $285,000 to Stockman and Dodd during 2010 as a result of Dodd and Stockman's solicitations. RI. [ROA.10636, 10642, 10662, 10705-06]. In email correspondence with Rothschild, Dodd presented Rothschild with the option of donating either to a 501(c)(4) organization (the Vanguard Organization) or a 501(c)(3) organization (Ross Center). RI [ROA.10644-45]. Dodd

presented the option of donating to the Ross Center as a way to obtain additional tax advantages. RI [ROA.10644-45]. Rothschild informed, via email, Sharron Angle, a Republican candidate for the U.S. Senate in 2010, that his donations to the Ross Center were part of his "substantial support" to her candidacy. RI [ROA.10738].

Stockman set aside a portion of Rothschild's donation to fund the production of the book described in the initial solicitation to Rothschild, and Stockman produced a draft of the book, which he sent to Rothschild. RI [ROA.1077 2-830]. Stockman's email transmitting the book draft indicated he was still awaiting additional information from, inter alia, Rothschild himself before the book could be finalized. RI [ROA.10772].

Ultimately, the book was not finalized and was not sent to voters as originally envisioned. A total of $75,995.50, or approximately 26.7% of the total funds donated by Rothschild to the Ross Center, was remitted to Dodd as "commission checks". RI [ROA.3555, 3574, 3585-86]. Other portions of the funds were used to pay for a variety of operating expenses including more expenses from Tom Dodd incurred before and after the 2010 election. [See RI ROA.10568, 10585].

After the 2010 election, Dodd and Stockman like other candidates began soliciting Rothschild for donations in connection with Stockman's campaign for the House of Representatives. RI [ROA.3599]. Rothschild donated $25,000 to the Ross Center on December 30, 2011, but did not donate to the Ross Center any more afterwards because the Ross Center's nonprofit status had expired. RI [ROA.11087]. Dodd received more

funds of $5,000 of this $25,000 donation as a fundraising commission, and further amounts were remitted to Donald Ferguson ("Ferguson") and Pat Murphy ("Murphy") RI [ROA.11088]. Ferguson worked on Stockman's campaign and later worked in Stockman's congressional office as press secretary. RI [ROA.4531, ROA.4610]. Murphy owned an empty commercial space that had previously been a motorcycle shop that Stockman rented as a campaign headquarters. RI [ROA.4354, 4529].

In 2013, Dodd and Stockman met with Richard Uihlein ("Uihlein"), a wealthy philanthropist, to solicit a donation to a project entitled, the "Congressional Freedom Foundation" and the "Congressional Freedom Caucus." RI [ROA.2122-23, 3942-43]. Dodd had previously solicited Uihlein for donations on behalf of The Leadership Institute and the Vanguard Organization. RI [ROA.2122]. Dodd understood the Congressional Freedom Foundation project to be run by and through Life Without Limits. RI [ROA.3943]. A central part of the project was an intern-training program, similar to that run by The Leadership Institute. RI [ROA.2124, 3942]. This training program was planned to perform its duties out of a residential home in Washington, DC to be purchased and renovated to allow several interns to live and work in the home, referred to as the "Freedom House." RI [ROA.2123-24]. However, the project had many other budget items which were presented to Uihlein other than the purchase and renovation of the Freedom House. [ROA.2131, 2133]. The Congressional Freedom Foundation project had a total planned budget of $2,464,000. RI [ROA.3948]. Of the total budget, $1,299,000 was allocated to

purchasing and renovating the Freedom House. [ROA.2131]. Dodd and Stockman did not represent to Uihlein that they had raised any other funds for the project, and Dodd understood that the donation they solicited from Uihlein was seed money and would need to be substantial augmented with other donations to meet the project's budget. RI [ROA.3944].

Dodd and Stockman also did not represent to Uihlein during their solicitation that they had already, contracted for, purchased, or possessed the residential home to be used as the Freedom House. RI [ROA.3946]. Dodd and Stockman originally requested a donation of approximately $1,000,000 from Uihlein. RI [ROA.3944-45]. Uihlein ultimately contributed $350,000 to Life Without Limits in response to the solicitation. Uihlein did not inform Dodd or Stockman that his contribution was restricted to be spent on only one part of the project. RI [ROA.2178].

Posey and Dodd continued working for over a month to identify a suitable property for the Freedom House, but ultimately Life Without Limits did not acquire any property to use for the Freedom House. RI [ROA.4242, 4923-25]. Dodd and Stockman solicited several other individuals and organizations in connection with the Congressional Freedom Foundation project but did not receive any additional contributions. RI [ROA.3676-82]. Dodd received a commission of $60,000 of the funds donated by Uihlein. RI [ROA.4502]. Dodd donated $10,000 to Safari Club International. RI [ROA.3677-78].

Life Without Limits paid Dodd $12,000 and Posey $12,500. RI [ROA.3653-58]. After the November election, Posey and Dodd wrote checks to Stockman's campaign totaling $15,000 ($7,500 each from Posey and Dodd). RI [ROA.3659, 4489]. These contributions were listed in a report filed with the Federal Election Commission ("FEC") as being from Posey's father and Dodd's mother, respectively. RI [ROA.4328-30]. This FEC report was prepared by Rabiah Zeidan ("Zeidan"), a Certified Public Accountant with a PhD in accounting, whose role with the Stockman campaign was to prepare the FEC filings. RI [ROA.4325]. Zeidan asked both Posey and Dodd to provide personal information for their parents to use in the FEC report. [ROA.4325-27]. Zeidan later filed an amended report with the FEC listing Posey and Dodd as the contributors, after a report published by a media organization called The Sunlight Foundation. RI [ROA.4339-41]. In response to the FEC request Stockman's campaign then reimbursed Posey and Dodd for the full amount of the contributions. RI [ROA.4348-50].

On or about March 12, 2014, in response to a request by Uihlein's office for documentation of the donation, Posey wrote a letter to Uihlein's office thanking him for his donation to Life Without Limits and representing the donation "allowed Life Without Limits to deliver medical supplies to third-world nations and support Freedom House." RI [ROA.4710]. Uihlein raised no objection in response.

In January 2014, Stockman met with Uihlein to gauge Uihlein's support for Stockman's candidacy for the Republican nomination in the U.S. Senate election in Texas

that year. RI [ROA.2139-40]. Stockman did not solicit any donation from Uihlein at that time. RI [ROA.2140].

Posey later solicited Uihlein for a donation on behalf of the Center for the American Future ("CAF") by phone and email. Larry Pratt ("Pratt"), another friend of Uihlein, informed Uihlein that Posey was planning an independent expenditure in support of Stockman's candidacy. RI [ROA.2152-53]. Uihlein did not make any donations in direct response to Posey's solicitations. However, Kurt Wagner ("Wagner") also solicited Uihlein for a donation in support of the Stockman campaign. [ROA.2155-57]. Wagner was an employee of CESI, a mailing company. RI [ROA.4652, 4676].

Wagner represented that CAF had printed a large number of "newspapers" and requested a donation of $450,571.65 for postage to deliver them to Texas voters. RI [ROA.2157]. Those "newspapers" contained a number of statements reporting that Stockman acted consistently with conservative ideology and that John Cornyn ("Cornyn"), Stockman's opponent during the Senate primary election, had not. RI [ROA.13106-21].

Uihlein made the requested donation with a check payable to the U.S. Postmaster for the amount requested. RI [ROA.2159-60]. Uihlein's donation was deposited into CESI's postage account. RI [ROA.4651-52]. CESI was retained to provide mailing services to deliver the newspapers. RI [ROA.4676]. However, the scale of the newspaper mailing project was too large for CESI to handle alone, so another company, PremierIMS,

was also retained. [ROA.4676]. Posey paid for printing the newspapers using accounts he set up for CAF. [ROA.4677, 10563].

Because of the large task, overtime and stress on the equipment CESI equipment broke down and was not able to complete the required task leaving a balance of unused funds.

Posey transferred funds to the CAF accounts from Life Without Limits. RI [ROA. 4677-78, 10563]. Stockman and Posey requested the unused postage by Wagner to "refund" a portion of the funds in CESI's postage account to CAF. RI [ROA.4699]. These funds were to be used to repay the amounts used in producing and distributing the newspaper, including amounts that came from Life Without Limits. RI [ROA.4699]. CAF received $214,718.51 of unused postage from CESI. RI [ROA.4701]. The balance of the $450,571.65 donation from Uihlein was used by CESI to pay for mailing the newspapers or was retained by CESI as compensation for the mailing services. RI [ROA.4700].

**Grounds for Challenge**

Defendant is seeking a hearing and full review of all of the following grounds which set forth the relevant supporting facts and will be further presented at the evidentiary hearing. The legal support is contained in the Memorandum of Law. Defendant is requesting an evidentiary hearing be set on his Motion and is seeking an Order vacating his convictions and giving him a new trial.

The following factual issues are set forth as a summary of the errors in the pretrial and trial proceedings that resulted in these violations and will be further developed in the evidentiary hearing. These grounds were not raised in the appeal because they related to failures by trial counsel to raise them, object or otherwise preserve the grounds. In some instances as noted, although raised, the appellate court stated that it was reviewed at a higher standard, plain error, instead of what would have been reviewed as an abuse of discretion had counsel raised it thus prejudicing Defendant. Additional information was not obtained because access to records were denied the defendant on the grounds they were sealed.

- Prosecutorial Misconduct- the government was allowed to weave a tale that went well beyond the actual charges as and did so in order to prejudice the jury against Defendant as well as confuse the jury. The questions by the jury showed their confusion. The government not only focused on alleged charitable contribution and election law violations that were not part of the charges, it knowingly misrepresented the evidence as to what a non-profit organization could do and what it could spend, it misrepresented evidence relating to Rothschild's intent as to his donations through impermissible hearsay, it confused Mr. Uihlein by telling him a false scenario about what funds were used for, and it intentionally failed to state what the actual crimes were such that the Defendant was not fully aware of what the crimes charged contained. Throughout trial, the government repeatedly referred to

"sham nonprofits", "bogus charities", "sham charity", "shell entity", "shams... that existed to deceive", etc. After repeatedly making those opinion-based type references to "sham non-profits" at trial, in closing the Government linked it all up by referring to "sham non-profits" to demonstrate Stockman's fraudulent intent: "this idea that there is a real charity doing real charitable work is a false pretense, which is another marker of fraud." The Government produced no evidence, or insufficient evidence, to support finding Defendant guilt of defrauding donors. There was no defrauded donor as part of the alleged fraudulent scheme as purported by the Government. Additional supporting facts and evidence will be filed in support of this motion.

- Failure by counsel to object to jury instruction this failure allowed the Government to ignore the language of its own indictment. The jury instruction instead offered a variation of the argument it advanced to save Count 12's incorrect jury instruction. Defense counsel failed to challenge incorrectly used terms that have well-defined meanings under federal campaign finance law as informed by more than four decades of jurisprudence resulting in incorrect and misleading jury instruction 12.
- Failure to pursue and preserve objections to failure of the indictment to make a proper statement of the crime- the Indictment was a fictional novel written to try and make Defendant out to be a sleazy politician who used charitable donations for his own benefit. The problem is that Defendant was not charged with those crimes.

The lengthy Indictment had very little to do with the actual charges yet defense counsel failed to properly challenge the substance of the Indictment and failed to require the Government to adequately clarify what the charges were based upon.

- Failure to properly present and object to evidence and instructions on 501(c)(3) and (4) entities- as in the Indictment itself, the majority of the trial was based on claimed improprieties as to 501(c)(3) and (4) organizations. Defendant was not charged with these violation, thus it was nothing more than a red herring and plot to simply discredit him yet defense counsel failed attempt to preclude this evidence. Further, defense counsel failed to bring in that the activities of Defendant were proper and legal under the law and instead left the jury with the belief that his actions were improper including basic examples of travel, food, and supplies that were legal yet made out to be unlawful to discredit Defendant.
- Failure to request a special verdict form- as the jury was clearly confused, defense counsel's failure to request a special verdict form prevented appellate counsel from effectively raising certain issues about what the jury relied upon and actually found.
- Failure to pursue a good faith instruction- while defense counsel asked for a good faith instruction on one count, defense counsel failed to request it on others, failed to bring in expert witnesses and witnesses that actually advised Defendant about his actions.

- Failure to call an expert on election law, campaign expenditures, and 501 (c) (4)'s ability to mail newspaper after judge qualified witness as an expert- despite moving for admission of an expert and it being granted after a hearing, defense counsel never called the expert witness leaving the jury without any guidance on the mailing legalities. Had the expert testified, he could have explain to the jury the misleading and legally incorrect arguments as to permissible activities.
- Failure to object to factual misstatements by the prosecution and misleading arguments- there were repeated misstatements of fact and law throughout yet defense counsel failed to object which resulted in the these statements coming in and the record not being preserved.
- Failure to argue that there was no defrauded donor as part of alleged 'fraudulent scheme' as purported by the government, violating Defendant's due process rights under the 14th Amendment, as well as his 6th Amendment rights to be informed of the accusation.
- Failure to file motions as directed by Defendant.
- Failure to present to the jury evidence and law to show the primary v exclusive use of funds for charitable purposes- defense counsel failed to present expert testimony and failed to request basic jury instructions that would have addressed this evidence, even though the evidence should have been precluded.

- Failure to demand any emails between Lois Lerner and the IRS or with DOJ personnel, or other IRS with DOJ concerning political retribution against Defendant- Defendant repeatedly asked his attorney to request or subpoena this information. Defense counsel failed to do so and failed to show the trial court how this targeted political retaliation showed bias, showed a violation of equal protection, and was failure of the Government to produce exculpatory evidence of bias. Like in the case now before the US Supreme Court, political prosecutions are unlawful and failure to obtain this evidence was prejudicial to Defendant.
- Failure to respond to a government's pre-trial motion.
- Failure to properly preserve pretrial and trial objections.
- Failure to provide Defendant his case file and records.
- Failure to conduct proper investigation.
- Failure to provide Defendant with evidence or present evidence uncovered by private investigator hired to obtain evidence- Defendant paid for a private investigator yet defense counsel failed to provide any of the information regarding witnesses false or misleading testimony.
- Refusal by counsel to file Motion on wrongful prosecution- to prove corruption, the courts recently have said there had to be a clear official government decision or act, essentially creating a more stringent definition of the law. Despite that, defense counsel failed to challenge the prosecution as simply a political prosecution when

case law states that acts such as gifts to office holders were permissible because in setting up meetings and making introductions for the businesspeople, the politician had not betrayed the office or, as the law says, taken an "official act." Defense counsel refused to pursue these matters as political retaliation.

- Failure to properly cross examine witnesses which would have shown conflicting testimony from witnesses, in particular Mr. Posey.
- Failure to interview any witnesses ahead of trial and thus be prepared for their testimony and impeachment the failure of defense counsel to know what the witnesses would testify to impaired the ability to effectively cross examine the witnesses.
- Failure to challenge judge's striking of witnesses the trial court would not permit the Defendant to call witnesses. As a result, Defendant's ability to defend himself resulted in a violation of his right to a fair trial.
- Failure to properly file the Motion to Dismiss in claiming that the donations were going to the campaign.
- Failure to call into question the legitimacy of the government's contention that Wells Fargo accounts were opened by the Defendant.
- Failure to properly argue that donors were not defrauded because the donations were not going into Defendant's campaign but were being used for legal non-profit purposes- defense counsel did not have a clear understanding of the issues herein.

Not only was the evidence irrelevant, the government was permitted to present false evidence and make improper arguments because defense counsel did not provide the appropriate law and facts.

- Failure to show that there was no evidence or that evidence was insufficient to support finding Defendant guilty of defrauding donors as part of the alleged fraudulent scheme as alleged by the Government.
- Failure to object to government misconduct in presenting a five year sequence of events related to expenditures of 501(c)(3) or (4) entities when there were no charges for those actions then misleading the juries about what was legal, as evidenced by the jury's confusion in its questions.
- Failure of counsel to understand what the laws were for which their client was charged resulting in incompetent defense- the failure to object and provide appropriate jury instructions showed a clear lack of understanding about the law directly related to the charged crimes resulting in a violation of Defendant's right to a fair trial.
- Failure to present law and evidence that expenditures were not fraudulent t but were within the non-profit laws and established protocol.
- Failure to explain the difference between "advocacy" and "express advcacy" and when each is legally allowed or prohibited.
- Failure to present claims of double jeopardy;

- Failure to present and preserve clear confrontation clause violations-

  The testimony by deceased victim Rothschild's assistant, was impermissible hearsay because it violated the confrontation clause. It was testimonial because Rothschild gave statements to police and to grand jury and the government and witness w aware of the prior statements and the witness allegedly used victim Rothschild's prior statements to form her "opinion" about his intent. The government should not have been permitted to allow any testimony about his intent and allowed evidence to come in knowing that victim Rothschilds had told police something different. Allowing "testimony" from the assistant about the victim's intent was a violation of the confrontation clause.
- Failure to submit proper jury instructions.
- Failure to challenge the judge's "finding" of express advocacy- the trial court improperly concluded that express advocacy existed. Not only was the legal basis incorrect, the matter should have been for the trier of fact.
- Failure to object and preclude evidence unrelated to Defendant - The trial court permitted and the defense did not object to submission of evidence relating to misconduct by others not on trial. The Government did so only to prejudice the jury to make Defendant appear to be directing the conduct despite the lack of evidence.

- Failure to require the "scheme" to be relevant to the charges, as opposed to the Government's performance of painting the Defendant as a "bad guy" thus confusing the jury.
- Failure to pursue the political motivation and retaliatory conduct and bias of Lois Lerner and her staff including failing to obtain disclosure and failure to cross examine.
- Failure to object to requested jury instructions - defense counsel did not object to the improper jury instructions.
- Failure to properly respond to jury's questions - when it became clear that the jury was confused, defense had the perfect opportunity to clarify and correct the actual charges and evidence. Defense counsel failed to do so resulting in the conviction.
- Failure to try and preclude witnesses - defense counsel should have precluded witnesses that were simply there to make Defendant look like he was misusing charitable contributions for other matters when they did not relate to the charges. Defense counsel also failed to preclude Rothschild's assistant from bringing in his state of mind.
- Failure to preserve multiplicitous and duplicitous arguments.
- Failure to pursue remand for improper prosecution comments and evidence in grand jury.

- Defense counsel appearing to concede guilt.
- Defendant contradicting their client.
- Presenting inconsistent defenses.
- Promising jury that Defendant would testify- once defense counsel told the jury that Defendant would testify, it was expected and thus when he did not, the jury believed he was hiding something.

**Relief requested**

Petitioner requests that the court grant the following relief:

1. The court conduct a hearing on the asserted constitutional and statutory violations set out in this motion.
2. The court issue an order vacating, setting aside, and correcting Defendant's conviction and sentence.
3. Grant a new trial.
4. Grant any other relief to which Defendant may be entitled.
5. If this Court denies Defendant's petition, provide a Certificate of Appealability be entered based on a substantial showing of the denial of a constitutional right.

**Conclusion**

Defendant's Motion should be granted based on the numerous substantial errors made by trial counsel that resulted in the violation of Defendant's constitutional rights.

Respectfully submitted this 5 day of October 5, 2021

By:______________________

Stephen E Stockman

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct. Executed this 5th day of October, 2019.

By:______________________

Stephen E. Stockman

Pro se